UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

RICKIE SLAUGHTER,

Petitioner,

v.

JEREMY BEAN,[1] et al.,

Respondents.

Case No. 3:16-cv-00721-ART-CSD

**MERITS ORDER**

**[ECF No. 91]**

Petitioner Rickie Slaughter, a Nevada prisoner who was convicted by a jury of conspiracy to commit kidnapping, conspiracy to commit robbery, attempted murder with the use of a deadly weapon, battery with the use of a deadly weapon, attempted robbery with the use of a deadly weapon, robbery with the use of a deadly weapon, burglary while in the possession of a firearm, burglary, first-degree kidnapping with the use of a deadly weapon causing substantial bodily harm, and five counts of first-degree kidnapping with the use of a deadly weapon, has filed a counseled Fourth-Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 91 ("Fourth-Amended Petition").) Slaughter alleges that the photographic lineup used by law enforcement was impermissibly suggestive, his trial and appellate counsel were ineffective, and the prosecution committed misconduct, exercised a racially motivated peremptory challenge, and failed to disclose material exculpatory information. (*Id.*) Respondents answered the Fourth-Amended Petition, and Slaughter replied. (ECF Nos. 127, 140.) For the reasons discussed below, this Court grants the Fourth-Amended Petition on grounds 11a and 11b based on the prosecution's failure to disclose exculpatory

---

[1] According to the Nevada Department of Corrections, Slaughter is incarcerated at High Desert State Prison. Jeremy Bean is the current warden for that facility. At the end of this Order, this Court kindly directs the clerk to substitute Jeremy Bean for Respondent Brian Williams. *See* Fed. R. Civ. P. 25(d).

information relevant to eyewitness identification and Slaughter's alibi defense.

## I.   BACKGROUND

### A.   Evidence Presented at Trial[2]

Ivan Young testified that at around 6:30 p.m. on June 26, 2004, he was at home in Las Vegas, Nevada painting cars in his garage while his wife, 10-year-old son, and 12-year-old nephew were inside. (ECF No. 21 at 13.) Two men walked up to Young and asked him about one of his cars. (*Id.* at 14.) After Young turned around to get a business card to give to one of the men, the man put a gun to Young's head. (*Id.* at 15.) The men ordered Young into his house, and Young complied. (*Id.*) The men asked where Young kept his money, guns, and valuables and then tied up the four occupants—Young, Young's wife, Young's son, and Young's nephew—with electrical cords. (*Id.*) The men, who had three guns, beat Young, and then one of the men shot Young in the face, resulting in Young losing his right eye. (*Id.* at 15–17.)

Jermaun Means testified that he went to Young's house on the evening of June 26, 2004, to see some car rims that Young was painting for him. (ECF No. 21 at 9.) As Means walked in the door to Young's house, he "was grabbed by two guys" who "brought [him] in the house and tied [him] up and robbed" him before leaving. (*Id.* 9–10.) Means saw Young "laying on the floor bleeding." (*Id.* at 10.) Means called 911 after the men left. (*Id.*)

Ryan John, whose girlfriend lived near Young, testified that on June 26, 2004, a man came out of Young's house, and as John was walking to his car, the man called him "and he was like, Ivan needs to talk to you." (ECF No. 21-3 at 18.) John thought this was weird, but he complied. (*Id.*) "[A]s soon as [John] go[t] through the door in the garage . . . , [the man] pushe[d] the door closed and put[ ]

---

[2] This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the Fourth-Amended Petition.

2

a gun underneath [his] throat." (*Id.*) The man "put [John] on [his] stomach and took [his] cell phone out of the pocket, broke it, and started going through all [John's] pockets." (*Id.*) The men tied up John and then pistol whipped, kicked, and hit him. (*Id.*) The men took John's debit card and withdrew funds from John's bank account later that evening. (*Id.* at 19.)

Following a confidential informant tip, Slaughter was identified by law enforcement as one of the possible suspects. Detective Jesus Prieto showed the seven witnesses a photo lineup containing Slaughter. Four of the seven witnesses—Means, Young, Johns, and Young's nephew—identified Slaughter from that initial lineup as being one of the suspects. (As discussed in ground 11a, a second pretrial photographic lineup was conducted in which none of the witnesses identified Slaughter; however, importantly, the second photographic lineup and its results were never presented to the jury.) At trial, only three of the witness—Young, Johns, and Young's nephew—identified Slaughter as one of the robbers. (ECF No. 21 at 11, 14, 18; ECF No. 21-3 at 21-22; ECF No. 22-1 at 14-15.)

Following Slaughter's apprehension, in the car that Slaughter had been driving, law enforcement found (1) a bullet casing that was consistent with the bullet fragments found at the crime scene and (2) two guns that matched the description of two of the three guns used during the robbery, although ballistics evidence showed that these two guns did not match the bullet fragments found at the crime scene. (ECF No. 21-3 at 33–38.) The second suspect was never apprehended.

The defense presented a mistaken identity defense. Noyan Westbrook testified as an alibi witness, explaining that she hung out with Slaughter "maybe three times," including "about the weekend before the 4th of July" in 2004. (ECF No. 22-1 at 21–23.) Tom Winters testified that he called Crime Stoppers after seeing news of the robbery on television because he recognized the robber as one

of his tenants, Eric Dawkins, based on his Jamaican accent, which the robbers were said to have, and his car (a green Chevy Malibu), which was like the one the robbers were seen driving. (*Id.* at 25–26.) Tiffany Johnson, Slaughter's girlfriend in June 2004, testified that Slaughter picked her up from work no later than 7:20 p.m. on June 26, 2004, making it unlikely that he committed the crime given that the 911 call was placed at approximately 7:00 p.m. (ECF No. 22-8 at 5–7.) Geoffrey Loftus testified as an expert witness about false memories and false identifications. (*Id.* 20–35.)

### B.        Procedural background

In 2005, Slaughter pleaded guilty to attempted murder with the use of a deadly weapon, robbery with the use of a deadly weapon, first-degree kidnapping with substantial bodily harm, and first-degree kidnapping with the use of a deadly weapon. (ECF No. 16-19.) Slaughter filed a state habeas petition, arguing, in part, that his plea was involuntary based on the promises that his sentence would permit his release in 15 years. (ECF No. 16-22.) The state court denied the petition, but on appeal, the Nevada Supreme Court remanded, instructing the state court to hold an evidentiary hearing to determine whether Slaughter's plea was voluntary. (ECF No. 16-40.) After conducting an evidentiary hearing, the state court again denied Slaughter's petition. (ECF No. 17-18 at 3.) Slaughter appealed, and the Nevada Supreme Court reversed, finding, in part, that Slaughter's plea was involuntarily entered. (*Id.*)

Following the withdrawal of Slaughter's guilty plea, a jury trial was held. (*See* ECF No. 25-10.) Slaughter was convicted and sentenced as follows:

| Count 1 | Conspiracy to commit kidnapping | 24-60 months |
| Count 2 | Conspiracy to | 24-60 months to run consecutive to count 1 |

|  | | |
|---|---|---|
|  | commit robbery | |
| Count 3 | Attempted murder with the use of a deadly weapon | 60-180 months plus a consecutive 60-180 months to run consecutive to count 2 |
| Count 5 | Attempted robbery with the use of a deadly weapon | 48-120 months plus a consecutive 48-120 months to run concurrent with count 3 |
| Count 6 | Robbery with the use of a deadly weapon | 48-120 months plus a consecutive 48-120 months to run consecutive to count 3 |
| Count 7 | Burglary while in the possession of a firearm | 48-120 months to run concurrent with count 6 |
| Count 8 | Burglary | 24-60 months to run concurrent with count 7 |
| Count 9 | First-degree kidnapping with the use of a deadly weapon causing substantial bodily harm | Life with the possibility of parole after 15 years plus a consecutive term of life with the possibility of parole after 15 years to run consecutive to count 6 |
| Count 10 | First-degree kidnapping with the use of a deadly weapon | Life with the possibility of parole after 5 years plus a consecutive term of life with the possibility of parole after 5 years to run concurrent with count 9 |
| Count 11 | First-degree kidnapping with the | Life with the possibility of parole after 5 years plus a consecutive term of life with the |

5

| | | |
|---|---|---|
| | use of a deadly weapon | possibility of parole after 5 years to run concurrent with count 9 |
| Count 12 | First-degree kidnapping with the use of a deadly weapon | Life with the possibility of parole after 5 years plus a consecutive term of life with the possibility of parole after 5 years to run concurrent with count 9 |
| Count 13 | First-degree kidnapping with the use of a deadly weapon | Life with the possibility of parole after 5 years plus a consecutive term of life with the possibility of parole after 5 years to run concurrent with count 9 |
| Count 14 | First-degree kidnapping with the use of a deadly weapon | Life with the possibility of parole after 5 years plus a consecutive term of life with the possibility of parole after 5 years to run concurrent with count 9 |

(ECF No. 25-10.) Slaughter appealed, and the Nevada Supreme Court affirmed on March 12, 2014. (ECF No. 26-7.) Slaughter filed a *pro se* state habeas petition on March 25, 2015. (ECF No. 26-13.) The state court denied the petition on July 14, 2015. (ECF No. 27-1.) Slaughter appealed, and the Nevada Supreme Court affirmed on July 13, 2016. (ECF No. 27-13.)

On February 12, 2016, Slaughter filed a second state habeas petition. (ECF No. 27-4.) The state court denied the petition. (ECF No. 27-11.) Slaughter appealed, and the Nevada Court of Appeals affirmed on April 19, 2017. (ECF No. 27-16.)

Slaughter filed a *pro se* federal habeas petition and an amended counseled habeas petition on December 20, 2016, and August 2, 2017, respectively. (ECF Nos. 6, 14.) On November 20, 2017, this Court granted Slaughter's motion for leave to conduct discovery and for a court order to obtain documents and

depositions. (ECF No. 31.) Thereafter, Slaughter filed his second-amended petition and third-amended petition on April 15, 2019, and January 23, 2020, respectively. (ECF Nos. 54, 64.) On September 22, 2020, this Court granted Slaughter's unopposed motion for a stay pending exhaustion of his unexhausted claims in state court. (ECF No. 81.)

On November 20, 2018, Slaughter filed a third state habeas petition. (ECF No. 84-1.) The state court denied the petition, and the Nevada Supreme Court affirmed on October 15, 2020. (ECF Nos. 84-12, 84-26.) On March 27, 2020, Slaughter filed a fourth state habeas petition. (ECF No. 84-20.) The state court denied this petition, and the Nevada Supreme Court affirmed on February 17, 2022. (ECF Nos. 84-29, 84-35.)

On May 11, 2022, this Court reopened this case. (ECF No. 90.) Slaughter filed his Fourth-Amended Petition, raising the following grounds:

1. The victims' in-court identifications stemmed from the State's use of an impermissibly suggestive photographic lineup.
2. His trial counsel failed to introduce foundational evidence regarding his alibi.
3. His trial counsel failed to fully cross examine and impeach the State's witnesses.
4. His trial counsel failed to call additional witnesses to provide exculpatory testimony.
5. His trial counsel failed to deliver on promises made during opening statements.
6. His trial counsel failed to object to various instances of prosecutorial misconduct.
7. The State committed prosecutorial misconduct during closing arguments.
8. The State presented hearsay evidence that denied him his ability to confront the witnesses against him.
9. His appellate counsel failed to raise meritorious issues on direct appeal.
10. The prosecution exercised a racially motivated peremptory challenge.
11. The prosecution failed to disclose material exculpatory information, made relevant misrepresentations in open court, and failed to correct false testimony.

Respondents moved to dismiss the Fourth-Amended Petition on January 18, 2023. (ECF No. 105.) Slaughter responded, and Respondents replied. (ECF Nos. 112, 115.) This Court granted the motion, in part, (1) dismissing ground 8 as untimely, (2) dismissing ground 9c as procedurally defaulted, (3) deferring consideration of whether Slaughter can demonstrate prejudice under *Martinez v. Ryan* to overcome the procedural default of grounds 2b, 3d, 5, and 6a-g, (4) deferring consideration of Slaughter can demonstrate cause to overcome the procedural default of grounds 7a-d until after it determines whether Slaughter can excuse the procedural default of ground 6, and (5) deferring consideration of whether Slaughter can demonstrate cause to overcome the procedural default of ground 10 until it determines in ground 9a whether Slaughter's appellate counsel was ineffective. (ECF No. 116.)

Respondents answered the remaining grounds in the Fourth-Amended Petition on April 19, 2024. (ECF No. 127.) Slaughter replied on February 18, 2025. (ECF No. 140.) Slaughter moved for an evidentiary hearing, Respondents opposed the motion, and Slaughter replied. (ECF Nos. 142, 144, 145.) Slaughter filed a notice of constitutional question on April 17, 2025. (ECF No. 146.) This Court ordered the United States Attorney General to intervene in this action if it so desired. (ECF No. 147.) The United States Attorney General filed a notice of appearance and a response. (ECF No. 148, 149.) Slaughter then filed a reply. (ECF No. 150-1.)

This Court denied the motion for evidentiary hearing on September 26, 2025. (ECF No. 151.) On November 14, 2025, this Court then held oral argument on the merits of the Fourth-Amended Petition. (ECF No. 157.) This Court now grants Slaughter federal habeas relief.

## II.   GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act

("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the first portion of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Lockyer v. Andrade*, 538 U.S. 63, 73, 75 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). And a state court decision involves an unreasonable application of Supreme Court precedent, within the second portion of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).

## III.    DISCUSSION

### A.    Ground 1

In ground 1, Slaughter alleges that the three victims' in-court identifications of him stemmed from law enforcement's use of an impermissibly suggestive photographic lineup, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 18.) Slaughter explains that in the lineup, his photo had different lighting than the other five photos and the background of his photo was transparent while the

other five photos had blue backgrounds. (*Id.*)

### 1. Background information

At a pretrial hearing on the issue of the photo lineup, Slaughter's trial counsel explained that Slaughter's picture was taken at the Las Vegas Metropolitan Police Department ("LVMPD"), which uses a white background, while "[e]verybody else['s picture] was taken from the North Las Vegas photo bank," which uses "a dark blue or bluish background." (ECF No. 19-1 at 9.) Slaughter's trial counsel argued the impermissibility of this: "Slaughter seems to stand out. It gives the halo effect. Which gives the person looking at it the opinion that everybody else . . . is just filler." (*Id.*) The trial court disagreed:

> I did look at the color lineup. I have to agree with the State. The thing that jumped out to me first is there is a guy wearing a yellow shirt, which isn't your client. Your client and everybody else is wearing black or dark blue shirts. They all have the same hair style, same kind of or similar facial hair, features. They all appear to be about the same age.
> If you look close at the color photo lineup, I think the background of Mr. Slaughter is blue as well. It's just a lot lighter than the background in the others. Lighter blue than the others are.
> All things being considered, I don't think it's a suggestive photo lineup, other than the guy in the yellow shirt. If he got identified and he was sitting here I think he'd have a much better argument to say, I'm the only one in the yellow shirt in the photo lineup. And that kind of stinks. But I don't think there needs to be an evidentiary hearing on the photo lineup. I think the photo lineup is proper. So the motion is going to be denied.

(*Id.* at 12–13.)

### 2. State court determination

In affirming Slaughter's Judgment of Conviction, the Nevada Supreme Court held:

> First, appellant argues that a suggestive pretrial photographic lineup impermissibly tainted in-court identifications, thereby violating his due process rights. In this, he contends that the photographic lineup was impermissibly suggestive because his photograph had a white background, whereas the other five photographs had a blue background, and his photograph differed from the others in age and condition. In assessing a challenge to a pretrial identification, we consider "(1) whether the procedure is unnecessarily suggestive, and (2) if so, whether, under all the circumstances, the identification is reliable despite an unnecessarily

10

suggestive identification procedure." *Bias v. State*, 105 Nev. 869, 871, 784 P.2d 963, 964 (1989). Considering the totality of the circumstances, a photographic lineup is suggestive when the procedure is so unduly prejudicial as to fatally taint a defendant's conviction. *Thompson v. State*, 125 Nev. 807, 813, 221 P.3d 708, 713 (2009). "[A] photographic identification must be set aside 'only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Cunningham v. State*, 113 Nev. 897, 904, 944 P.2d 261, 265 (1997) (quoting *Simmons v. United States,* 390 U.S. 377, 384 (1968)).

After reviewing the photographic lineup, the district court found that appellant and four of the five remaining persons in the photographs wore black or dark blue shirts, they all had the same hairstyle, facial hair and features, and appeared to be about the same age. The district court further concluded that the background of appellant's photograph was blue but that it was "just a lot lighter than the background in the others." Determining that the photographic lineup was proper, the district court denied appellant's motion to preclude the evidence. We conclude that the district court did not err in this regard.

(ECF No. 26-7 at 3–4.)[3]

### 3.    Standard

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). A two-step inquiry is used to determine whether a pretrial identification procedure violates a suspect's due-process rights. "First, the trial court must decide whether the police used an unnecessarily suggestive identification procedure." *Perry v. New Hampshire*, 565 U.S. 228, 235 (2012). Second, if there was improper police conduct, "the court

---

[3] Slaughter argues that the Nevada Supreme Court's decision was contrary to clearly established federal law because, under *Simmons* and its progeny, a lineup is suggestive it if creates a substantial likelihood of misidentification, but the Nevada Supreme Court applied a "fatally taint" standard instead. (ECF No. 140 at 57.) This argument lacks merit. The Nevada Supreme Court applied the correct federal law. It cited a Nevada case, *Cunningham*, which quoted *Simmons*, in stating the correct standard: "[A] photographic identification must be set aside 'only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" (ECF No. 26-7 at 3–4.)

must next consider whether the improper identification procedure so tainted the resulting identification as to render it unreliable and therefore inadmissible." *Id.* "[R]eliability [of the eyewitness identification] is the linchpin of [this] evaluation." *Id.* at 239 (internal quotation marks omitted). In determining the likelihood of misidentification, the following factors are considered: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

### 4.    Analysis

The Nevada Supreme Court reasonably determined that the photo lineup was not impermissibly suggestive. This Court acknowledges and appreciates that the background of Slaughter's photo in the sixth position of the photo lineup is lighter than the backgrounds of the five other photos and that there is no lighting glare on Slaughter's face as compared to the men in the other five photos. (*See* ECF No. 15-9.) However, these amount to only minor variations between Slaughter's photo and the filler photos. *See, e.g.*, *United States v. Robertson*, 606 F.2d 853, 857 (9th Cir. 1979) ("Mere variations in appearance among persons or photographs presented to a witness do not automatically invalidate a pretrial identification."). These minor variations do not rise to the level of emphasizing the focus on Slaughter. Rather, as the trial court reasonably noted, the important details are all similar: the men's ages, hair styles, facial hair, and features. Because the five filler photos were not dissimilar in appearance to Slaughter in terms of important attributes, the Nevada Supreme Court reasonably concluded that the first step in the inquiry of whether the pretrial identification procedure violated Slaughter's due-process rights was not met, negating the need to move to the second step.

12

Accordingly, the Nevada Supreme Court's denial of relief on this claim during Slaughter's direct appeal proceedings was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Slaughter is not entitled to federal habeas relief for ground 1.

**B.      Ground 2**

In ground 2, Slaughter alleges that his trial counsel failed to introduce foundational evidence regarding his alibi in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 25.)

Slaughter's alibi defense is one of impossibility, namely, that it would have been physically impossible for him to travel ten miles—from the crime scene to picking up his girlfriend at her work—in less than fifteen minutes. Slaughter contends that the robbery ended roughly at 7:08 p.m., but by about 7:15 p.m., he was 10 miles—meaning at least 20 minutes—away picking up Johnson, his girlfriend, from work. (*See* ECF No. 140 at 62.) Slaughter alleges that his counsel failed to present a fulsome version of this alibi, explaining that all the jury heard was that the home invasion ended sometime around 7:00 p.m.; he picked up Johnson sometime between 7:00 and 7:30 p.m., depending on who the jurors believed[4]; and it took an unknown amount of time to drive from the crime scene to her workplace. (*Id.* at 62–63.) Slaughter alleges that his trial counsel should have (a) subpoenaed the 911 records to pin down when the victims first called the police; (b) drawn the jury's attention to evidence about how much time elapsed between when the culprits left the house and when the victims called the police; (c) called witnesses or introduced evidence to prove exactly how long it

---

[4] Johnson testified Slaughter picked her up between 7:00 and 7:15 p.m., but in no event was it later than 7:20 p.m. (ECF No. 22-8 at 9.) Comparatively, Jeffrey Arbuckle, Johnson's coworker, testified that Slaughter did not show up until 7:30 p.m. (ECF No. 21-3 at 13.)

would take to get from the crime scene to Johnson's workplace; (d) introduced evidence to impeach Johnson's coworker's testimony that Slaughter did not pick up Johnson until after 7:30 p.m. on the evening of the robbery, including questioning him about his prior inconsistent statement that he left work on the day in question at 7:15 p.m., showing that he was biased against Slaughter based on a verbal alteration the two previously had, and asking him whether he had received any funds from the State for pre-trial preparation; and (e) refrained from calling Westbrook, who provided inconsistent and confusing testimony regarding his alibi. (ECF No. 91 at 25–32.)

### 1. Standard

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland,* establishing that the decision was

14

unreasonable is especially difficult. *See Richter,* 562 U.S. at 104–05. In *Richter,* the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington,* 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter,* 562 U.S. at 105.

### 2.   State court determination

In affirming the denial of Slaughter's first state habeas petition, the Nevada Supreme Court denied the claim due to what it described as overwhelming evidence of guilt:

> In his petition, Slaughter contended that trial counsel was ineffective for failing to . . . (3) present evidence regarding the timing of a 911 call, (4) discover impeachment evidence regarding Jeff Arbuckle, . . . and (6) . . . eliciting testimony from Noyan Westbrook. The district court denied these claims without conducting an evidentiary hearing. We conclude that the district court did not err. Although the district court's reasoning regarding the deficiency component of some of Slaughter's claims erroneously assumed disputed facts to be true, we agree with the district court that an evidentiary hearing was not required under the circumstances, *see Hathaway v. State,* 119 Nev. 248, 255, 71.P.3d 503, 508 (2003) (recognizing that an evidentiary hearing is warranted where a petitioner's claim is "supported by specific facts not belied by the record, which if true, would entitle him to relief"), and that Slaughter failed to demonstrate prejudice because the evidence against him was overwhelming. Multiple eyewitnesses identified Slaughter at trial and in a photographic lineup as one of the suspects and several identified him as the shooter. Slaughter's girlfriend owned a vehicle which resembled that described by the witnesses, and in it, law enforcement found two firearms consistent with those used in the crimes and ammunition consistent with ballistic evidence recovered from the scene. In addition, the district court found that Slaughter was depicted in surveillance footage using a victim's stolen ATM card and that he made statements which indicated that he was attempting to fabricate an alibi. We give deference to these findings. *See Lader,*

15

121 Nev. at 686, 120 P.3d at 1166. Thus, even assuming that counsel were deficient, Slaughter failed to demonstrate a reasonable likelihood of a different result.

(ECF No. 27-13 at 2–4.)[5]

### 3.    Procedural default

Slaughter previously acknowledged that ground 2b—the portion of this ground arguing that his trial counsel should have drawn the jury's attention to evidence about how much time elapsed between when the culprits left Young's house and when the victims called the police—is procedurally defaulted. (ECF No. 116 at 24.) However, he contended that he could demonstrate cause and prejudice to overcome the procedural default pursuant to *Martinez v. Ryan*. (ECF No. 112 at 23–25.) This Court found that Slaughter had arguably met three of the elements under *Martinez*: (1) he had no counsel during his initial-review collateral proceeding, (2) his state post-conviction petition was the initial proceeding regarding claims of ineffective assistance of trial counsel, and (3) Nevada law requires that a claim of ineffective of assistance of trial counsel be raised in a post-conviction habeas corpus proceeding. (ECF No. 116 at 25.) Because the analysis of prejudice under *Martinez* to overcome the procedural default is necessarily intertwined with the merits of this ground, this Court deferred a determination of the fourth element of *Martinez*: whether grounds 2b

---

[5] Slaughter argues that the Nevada Supreme Court's logic here was flawed because "[t]he state court reasoned that because the prosecution presented so-called overwhelming evidence, there was no way [he] could demonstrate prejudice, even if the alibi was indisputably airtight." (ECF No. 140 at 68.) This Court does not read the Nevada Supreme Court's decision as saying that no alibi, no matter how persuasive, could justify relief because there was overwhelming evidence of the defendant's guilt. Rather, the Court presumes that the Nevada Supreme Court assessed the alibi evidence—even if it was not discussed outright—but found it was not persuasive in light of what it described as overwhelming evidence of guilt. *See Johnson v. Williams,* 568 U.S. 289, 293 (2013) ("[W]hen a state court issues an order that summarily rejects without discussion *all* the claims raised by a defendant, . . . the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." (Emphasis in original)).

16

is substantial. (*Id.*) On this issue, this Court's review is de novo. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019).

### 4.    Analysis

Slaughter's trial counsel's presentation of an alibi defense was lackluster at best. As Slaughter contends, it would have been highly prudent for his trial counsel to have pinned down when the victims first called the police, shown how much time elapsed before the victims called the police, introduced evidence showing the travel time between Young's house and Johnson's workplace, impeached Johnson's coworker, and focused on his alibi involving picking up Johnson from work rather than calling Westbrook to show where he was before heading to Johnson's workplace. However, regarding grounds 2a, 2c, 2d, and 2e, this Court is required to defer to the Nevada Supreme Court's prejudice assessment given that it was not an unreasonable application of *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts. Indeed, based solely on the evidence that the Nevada Supreme Court considered, there was strong evidence of Slaughter's guilt.[6] First, four of the witnesses identified Slaughter from the photo lineup, and three witnesses identified Slaughter at trial. Second, a surveillance video from 7-Eleven showed a man potentially resembling Slaughter with "a mask over . . . a part of his face" using Johns' card at the ATM. (ECF No. 21-3 at 11.) Third, Slaughter was driving a vehicle on the date of the robbery that potentially matched the getaway vehicle. (*See* ECF No. 21 at 14 (testimony that the culprits were driving a green Ford Taurus); ECF No. 21-3 at 13 (testimony from Johnson's coworker that Slaughter

---

[6] Notably, as will be discussed in ground 11, there were two pieces of suppressed evidence that would have weakened the evidence of Slaughter's guilt and strengthened the evidence of his alibi. However, this Court cannot consider these two pieces of evidence—and their effect on the other evidence—in evaluating the Nevada Supreme Court's prejudice analysis here. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

was seen driving Johnson's green Ford Taurus on the date of the incident); ECF No. 22-1 at 22 (Westbrook's testimony that Slaughter drove a green Taurus).) Fourth, weapons and ammunition in the car that Slaughter was driving on the date of the robbery were potentially consistent with the weapons used in the crimes. (ECF No. 21 at 41-48; ECF No. 21-3 at 36-44.) And fifth, Slaughter's phone call to Johnson after his arrest could be interpreted as him fabricating an alibi. (ECF No. 22-3 at 5.)

Turning to the evidence of Slaughter's alibi, Slaughter litigated this claim *pro se* during his first state habeas proceedings. As such, the alibi evidence before the state court and Nevada Supreme Court at the time it considered this claim was not especially developed, substantiated, or expressed. Under these circumstances, the evidence of Slaughter's alibi was speculative in comparison with the evidence of his guilt.[7] *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir.

---

[7] Slaughter argues that the state court's factfinding process was defective because it denied his request for an evidentiary hearing. (ECF No. 140 at 68.) "In some limited circumstances, we have held that the state court's failure to hold an evidentiary hearing may render its fact-finding process unreasonable under § 2254(d)(2)." *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012). The "ultimate issue" in resolving this dispute "is whether the state's fact-finding procedures were reasonable; this is a fact-bound and case-specific inquiry." *Id.* Here, Slaughter requested an evidentiary hearing, but he never requested the appointment of counsel. (ECF Nos. 26-13; 26-17 at 3.) The state court found—and the Nevada Supreme Court agreed—that an evidentiary hearing was not required under the circumstances of his case for the following reasons:

> In this particular case, because of the amount of specificity that he's put into everything, it's very clear what it is that he is alleging that he thinks was at fault. I don't have any question about any of those issues, I also think the record that we have from the trial is equally clear about what it what that occurred such that you can look at everything in the pleadings without the need for an evidentiary hearing. I don't think in sum that there needs to be any investigation beyond the record or a need to call any of the counsel or anybody as witnesses to further flesh out any of the issues that are there.

(ECF No. 26-17 at 4.)

Here, Slaughter failed to raise any factual question in his *pro se* petition, and, given that he did not move for the appointment of counsel which would have

2019) ("*Strickland* prejudice is not established by mere speculation.").

Consequently, the Nevada Supreme Court's denial of relief on this claim—minus ground 2b—was neither contrary to, nor an unreasonable application of, *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts. Slaughter is not entitled to federal habeas relief for grounds 2a, 2c, 2d, and 2e.

And regarding ground 2b, Slaughter alleges that his trial counsel should have proven how long it took Means to call 911. (ECF No. 91 at 27.) As already discussed, Slaughter's trial counsel's presentation of his alibi defense, including this issue, was weak. However, Slaughter fails to demonstrate prejudice under *Strickland* for ground 2b even under a de novo standard of review. The prosecution played Means' 911 call during the trial wherein he stated that the incident took place "about five . . . five minutes ago." (ECF No. 41-7.) Even if Slaughter's trial counsel acted deficiently by not capitalizing on this fact, the jury was still given this information. Therefore, ground 2b is not substantial, so it is dismissed as procedurally defaulted.

### C.    Ground 3

In ground 3, Slaughter alleges that his trial counsel failed to fully cross examine and impeach the State's witnesses, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 91 at 32.) Specifically, Slaughter alleges that his counsel failed to (a) ask the victims about a second photo lineup, (b) fully cross examine Young, (c) fully cross examine John, and (d) fully cross-examine the State's firearm expert. (*Id.* at 32–38.)

#### 1.    State court determination

---

provided a basis for the potential development of factual questions to be answered at an evidentiary hearing, the state court's decision not to hold an evidentiary hearing here did not render its fact-finding process unreasonable. *See Hibbler*, 693 F.3d at 1147 ("[T]he state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question.").

In affirming the denial of Slaughter's first state habeas petition, the Nevada Supreme Court held:

> In his petition, Slaughter contended that trial counsel was ineffective for failing to . . . adequately cross-examine the State's witnesses . . . . The district court denied these claims without conducting an evidentiary hearing. We conclude that the district court did not err. Although the district court's reasoning regarding the deficiency component of some of Slaughter's claims erroneously assumed disputed facts to be true, we agree with the district court that an evidentiary hearing was not required under the circumstances, *see Hathaway v. State,* 119 Nev. 248, 255, 71.P.3d 503, 508 (2003) (recognizing that an evidentiary hearing is warranted where a petitioner's claim is "supported by specific facts not belied by the record, which if true, would entitle him to relief"), and that Slaughter failed to demonstrate prejudice because the evidence against him was overwhelming. Multiple eyewitnesses identified Slaughter at trial and in a photographic lineup as one of the suspects and several identified him as the shooter. Slaughter's girlfriend owned a vehicle which resembled that described by the witnesses, and in it, law enforcement found two firearms consistent with those used in the crimes and ammunition consistent with ballistic evidence recovered from the scene. In addition, the district court found that Slaughter was depicted in surveillance footage using a victim's stolen ATM card and that he made statements which indicated that he was attempting to fabricate an alibi. We give deference to these findings. *See Lader,* 121 Nev. at 686, 120 P.3d at 1166. Thus, even assuming that counsel were deficient, Slaughter failed to demonstrate a reasonable likelihood of a different result.

(ECF No. 27-13 at 2–4.)

### 2.    Ground 3a

In ground 3a, Slaughter alleges that his trial counsel failed to ask the victims about a second photo lineup. (ECF No. 91 at 33.)

A second photo lineup was created for the identification of the second robber. (*See* ECF No. 18 at 7; *see also* ECF No. 65-2 at 7–10 (four versions of the second photo lineup).) That photo lineup included the second suspect, Jaquan Richard, but it also mistakenly contained a photo of Slaughter—in fact, his booking photo after he was identified from the first photo lineup was included. (ECF No. 18 at 7.) As will be discussed in ground 11, two years after Slaughter's first state habeas proceedings concluded, it was confirmed that none of the witnesses verbally identified Slaughter when they were shown the second photo

lineup.

Like ground 2, this Court is required to defer to the Nevada Supreme Court's prejudice assessment given that it was not an unreasonable application of *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts. The significance of the second photo lineup, which is discussed within ground 11, was not developed until after the Nevada Supreme Court denied this claim. Rather, at the time the Nevada Supreme Court considered this claim, the results of the second photo lineup were nebulous, meaning any impeachment value to be ascertained from those results was also nebulous. Comparatively, as was discussed in ground 2, based solely on the evidence that the Nevada Supreme Court considered, there was strong evidence of Slaughter's guilt, so Slaughter fails to demonstrate that he is entitled to federal habeas relief for ground 3a.

### 3. Ground 3b

In ground 3b, Slaughter alleges that his trial counsel failed to fully cross-examine Young about his story having changed in several key respects. (ECF No. 91 at 34.) Slaughter gives the following examples. First, at the preliminary hearing, Young testified that the other robber, not Slaughter, had dreadlocks, and he "believe[d Slaughter] had a hat on." (ECF No. 15-19 at 8–9.) However, at the trial, Young testified that "[i]t looked like they were wearing like hats and wigs." (ECF No. 21 at 15.) Second, at the preliminary hearing, Young testified that "[o]ne dude was trying to talk in Jamaican." (ECF No. 15-19 at 9.) However, at trial, Young testified that "*they* kept on talking like in Jamaica accents and stuff." (ECF No. 21 at 15 (emphasis added).) Third, at the preliminary hearing, Young described Slaughter as being only around 5 foot 5 inches or 5 foot 6 inches tall (ECF No. 15-19 at 8), although Slaughter is 5 foot 9 inches tall.

Even if Slaughter's trial counsel failed to question Young about these inconsistencies during cross-examination, this Court finds that the Nevada

Supreme Court reasonably found that Slaughter fails to demonstrate prejudice. Young "underwent a number of medical procedures" following being shot in the face and testified that his memory was "foggy" when he was questioned by police in the hospital. (ECF No. 21 at 17.) Given Young's potential recollection issues stemming from his facial gunshot wound, it is understandable that Young's memories may not have been as sharp as the other witnesses. This logical explanation for Young's inconsistent statements persuades this Court that the Nevada Supreme Court's denial of relief on this claim was neither contrary to, nor an unreasonable application of, *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts. Slaughter is not entitled to federal habeas relief for ground 3b.

### 4.    Ground 3c

In ground 3c, Slaughter alleges that his trial counsel failed to fully cross-examine John. (ECF No. 91 at 36.)

At the preliminary hearing, John testified that the suspects placed "a jacket over [his] head" after he entered Young's house, saw Young's wife tied up, was told to get on the ground, was tied up, and was kicked in the head. (ECF No. 15-19 at 16.) Contrarily, at the trial, John testified that he "was like watching trying to see what was going on" during the incident and saw the men "walking around, going through everything, going through everybody's pockets." (ECF No. 21-3 at 20.) John explained that the men only "cover[ed] everybody's heads up" after they shot Young. (*Id.*)

Even though Slaughter's trial counsel missed this opportunity to question John about inconsistencies regarding when the jacket had been put over his head, the Nevada Supreme Court reasonably determined that Slaughter fails to demonstrate prejudice. Regardless of whether the jacket was placed on John's head after being tied up or whether it took place later in the robbery after John had more time to view what was going on, John was still able to see the two men

22

before the jacket was placed on his head. Consequently, this discrepancy between his preliminary hearing testimony and trial testimony was relatively minor. *See also Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that the defendant's trial counsel "could have done a much better job of impeaching [the witness], . . . but the failures regarding impeachment of [the witness] are of comparatively little consequence"). As such, the Nevada Supreme Court's denial of relief on this claim was neither contrary to, nor an unreasonable application of, *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts. Slaughter is not entitled to federal habeas relief for ground 3c.

### 5.   Ground 3d

In ground 3d, Slaughter alleges that his trial counsel failed to fully cross-examine the prosecution's firearm expert. (ECF No. 91 at 36.) Slaughter previously acknowledged that this ground is procedurally defaulted but contended that he could demonstrate cause and prejudice to overcome the procedural default under *Martinez*. (*See* ECF No. 116 at 24.) As with ground 2b, this Court deferred a determination of the fourth element of *Martinez*—whether this ground is substantial—until merits review. (*Id.* at 25.)

Angel Moses, who worked for the LVMPD's forensic lab specializing in firearms identification, testified at Slaughter's trial that the bullet fragments from the robbery "were consistent with a Winchester .357 Magnum silver tip hollow point," which is the type of shell casing found in Slaughter's girlfriend's car. (ECF No. 21-3 at 33, 38.) Slaughter alleges that his trial counsel should have cross-examined Moses on this finding, noting that an expert originally hired by his counsel concluded that at least nine other bullet calibers and brands could be consistent with the fragments from the robbery. (ECF No. 91 at 37 (citing ECF No. 27-5 at 8).) This argument is at least partially belied by the record.

During cross-examination, Slaughter's trial counsel clarified that the bullet

fragments were "deformed" and questioned if, given "th[e] particular weight, and/or diameter of the size" of the "lead core," it could have come from "other calibers as well," including ".357, a .38 Special, a .380 auto." (ECF No. 21-3 at 41.) Moses answered in the affirmative: "it could be any of those. What I would call those are medium caliber, so any of those particular ones it would fit." (*Id.*) Slaughter's counsel then took this a step further, asking "maybe even slightly larger, since it may have . . . lost some of its grains, a nine millimeter, a .45, or 10 millimeter as well?" (*Id.*) Moses responded, "[t]hat's correct." (*Id.*) Turning to the manufacturer, Slaughter's counsel asked if the lead core fragments were "consistent with another . . . manufacturer" besides Winchester, and Moses responded, "[t]hat's correct." (*Id.* at 42.) Therefore, even though Slaughter's trial counsel's questions in this regard focused solely on the lead core—rather than, e.g., also asking about the bullet jacketing[8]—Slaughter fails to show that his trial counsel acted deficiently.

Moreover, even if Slaughter's trial counsel acted deficiently, Moses's testimony merely showed consistency between the bullet fragments from the robbery and the shell casing found in Slaughter's girlfriend's car. There was no evidence showing an exact match, so even if Slaughter's trial counsel had been able to further weaken the link between the evidence in Slaughter's possession compared with the bullets used during the robbery, Slaughter fails to show that the jury would have reached a different conclusion.

Slaughter's ineffective assistance of trial counsel claim is not substantial because he fails to demonstrate ineffectiveness under *Strickland*, so he fails to overcome the procedural default of ground 3d. Ground 3d is dismissed.

---

[8] Moses testified that she could not "specifically say a particular brand of who made that lead core" because it was too generic, but, regarding "the other fragments that [she] looked at, . . . their design features and elemental analysis [were] consistent with a Winchester type silver type hollow point bullet." (ECF No. 21-3 at 47.)

**D.   Ground 4**

In ground 4, Slaughter alleges that his trial counsel failed to call additional witnesses to provide exculpatory testimony, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 38.) Specifically, Slaughter alleges that his counsel failed to call (a) Detective Prieto, (b) Officer Anthony Bailey, (c) Destiny Waddy, and (d) Officer Mark Hoyt. (*Id.* at 38–45.)

**1.   State court determination**

In affirming the denial of Slaughter's first state habeas petition, the Nevada Supreme Court held:

> In his petition, Slaughter contended that trial counsel was ineffective for failing to (1) elicit testimony from Detective Jesus Prieto, Officer Anthony Bailey, Officer Mark Hoyt, Craig Retke, and Destiny Waddy . . . . The district court denied these claims without conducting an evidentiary hearing. We conclude that the district court did not err. Although the district court's reasoning regarding the deficiency component of some of Slaughter's claims erroneously assumed disputed facts to be true, we agree with the district court that an evidentiary hearing was not required under the circumstances, *see Hathaway v. State,* 119 Nev. 248, 255, 71.P.3d 503, 508 (2003) (recognizing that an evidentiary hearing is warranted where a petitioner's claim is "supported by specific facts not belied by the record, which if true, would entitle him to relief'), and that Slaughter failed to demonstrate prejudice because the evidence against him was overwhelming. Multiple eyewitnesses identified Slaughter at trial and in a photographic lineup as one of the suspects and several identified him as the shooter. Slaughter's girlfriend owned a vehicle which resembled that described by the witnesses, and in it, law enforcement found two firearms consistent with those used in the crimes and ammunition consistent with ballistic evidence recovered from the scene. In addition, the district court found that Slaughter was depicted in surveillance footage using a victim's stolen ATM card and that he made statements which indicated that he was attempting to fabricate an alibi. We give deference to these findings. *See Lader,* 121 Nev. at 686, 120 P.3d at 1166. Thus, even assuming that counsel were deficient, Slaughter failed to demonstrate a reasonable likelihood of a different result.

(ECF No. 27-13 at 2–4.)

**2.   Ground 4a**

Regarding Detective Prieto, Slaughter alleges that his trial counsel could have elicited the following facts: (1) he failed to collect surveillance footage from

25

the area near Johnson's workplace, (2) he manipulated Johnson regarding the exact time Slaughter picked her up, (3) he failed to confirm Jeff Arbuckle, Johnson's coworker, told him he left work at 7:15pm, not 7:30pm, (4) he put together the suggestive first photo lineup and mistakenly included Slaughter in the second photo lineup, (5) his search warrant affidavit said that witnesses described the getaway car as a Pontiac or a Ford when Destiny Waddy, Means's girlfriend, told the police the getaway car was a Pontiac Grand Am, (6) he stated in 2004 that there was no blood found on Slaughter's shoes but in 2009 he said the substance he thought was blood was covered by polish, (7) the police rushed to judgment in this case and spent very little time looking at other suspects, and (8) there were inconsistencies in Young's and Arbuckle's statements. (ECF No. 91 at 38–43.)

Slaughter's trial counsel missed the opportunity to question Detective Prieto about his shoddy investigation in this case by not taking the precautionary step of subpoenaing him in case the prosecution decided not to call him, which ended up being the situation at hand. However, like ground 2, this Court is required to defer to the Nevada Supreme Court's prejudice assessment given that it was not an unreasonable application of *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts. Detective Prieto's investigation, while undoubtedly inferior, was assessed by the Nevada Supreme Court in conjunction with the entirety of the evidence that was presented at Slaughter's trial, without the benefit of Detective Prieto's later deposition, and without attorney development or elaboration given that Slaughter litigated this claim *pro se*. Under these circumstances, the evidence presented at trial of Slaughter's guilt would have only been mildly influenced by Detective Prieto's lazy and limited investigation. Accordingly, based on the evidence that the Nevada Supreme Court considered at the time it denied this claim, as was discussed in ground 2, there was what it described as strong evidence of Slaughter's guilt, so

26

Slaughter is not entitled to federal habeas relief for ground 4a.

### 3.  Ground 4b

Regarding Officer Bailey, Slaughter alleges that his trial counsel could have elicited from him the inconsistencies in Young's statements. (ECF No. 91 at 43–44.) For the reasons discussed in ground 3b regarding the inconsistencies in Young's statements, this Court finds that the Nevada Supreme Court's denial of relief on this claim was neither contrary to, nor an unreasonable application of, *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts. Slaughter is not entitled to federal habeas relief for ground 4b.

### 4.  Ground 4c

Regarding Waddy, who was waiting in Means's car while Means and the other victims were tied up in Young's house, Slaughter alleges that his trial counsel could have questioned her about the robbers having left in a car that she described as possibly being a Pontiac Grand Am. (ECF No. 91 at 44.) Waddy's testimony regarding the make and model of car the robbers were driving would have provided potentially beneficial evidence for Slaughter given that it conflicted with a finding that the robbers were driving Johnson's Ford Taurus. However, again, the Nevada Supreme Court reasonably determined that Slaughter fails to demonstrate prejudice. Waddy's statement to police that the robbers were *possibly* driving a Pontiac Grand Am lacks assuredness. Given the similarity between a Ford Taurus and a Pontiac Grand Am and given Waddy's doubtful belief about the make and model of the car, any prejudice stemming from Slaughter's failure to call Waddy is uncertain. As such, because the Nevada Supreme Court's denial of relief on this claim was neither contrary to, nor an unreasonable application of, *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts, Slaughter is not entitled to federal habeas relief for ground 4c.

**5.**   **Ground 4d**

Regarding Officer Hoyt, Slaughter alleges that his trial counsel could have questioned him about Waddy's statement about the getaway car possibly being a Pontiac Grand Am and about John's initial statement to the police that his head had been covered for much of the incident, which contradicted his account at trial that his head was uncovered until after the shooting. (ECF No. 91 at 45.) For the reasons discussed in ground 4c regarding Waddy and reasons discussed in ground 3c regarding John, this Court finds that the Nevada Supreme Court's denial of relief on this claim was neither contrary to, nor an unreasonable application of, *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts. Slaughter is not entitled to federal habeas relief for ground 4d.

**E.**   **Ground 5**

In ground 5, Slaughter alleges that his trial counsel failed to deliver on his promises made during opening arguments, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 45.) Specifically, Slaughter alleges that his trial counsel promised the jury that it would learn about Slaughter's alibi, that Westbrook would be a star witness, and that the jury would hear from Detective Prieto and Waddy. (*Id.* at 45–46.) This Court previously determined that this ground is procedurally defaulted and deferred a determination of prejudice under *Martinez* to overcome this default until merits review. (ECF No. 116 at 22, 25.)

**1.**   **Background information**

During opening arguments, Slaughter's trial counsel made the following statements regarding Westbrook:

> One of the witnesses that is going to come in and testify is a woman named Monique Westbrook. She will testify to you on June 26, 2004, she called Rickie at about 2:00 p.m. She'll testify to you that at 2:00 o'clock they scheduled an appointment to meet together and they got

together about 4:00 o'clock that afternoon.

She'll testify that where she lived at that time was an apartment . . . approximately ten miles from [where Young got shot]. . . . she'll testify that she and Rickie were together from 4:00 o'clock that afternoon until 7:00 p.m. when he left to go pick up his girlfriend at the time.

(ECF No 21 at 7.) In addition to this information about his alibi, Slaughter's trial counsel also discussed Johnson, saying that she "says pick me up at 7:00 o'clock maybe as late as 7:15 but it was nowhere near 7:30. There's no way he can drive from [Young's house] all the way to where she worked in four minutes. It just [wasn't] possible." (*Id.*)

Turning to Waddy, Slaughter's trial counsel stated that "[i]f she's going to testify," he expected her evidence to show that "she saw a green Pontiac Grand Am." (*Id.* at 7–8.) And regarding Detective Prieto, Slaughter's trial counsel stated, in the context of presenting Dawkins as an alternate suspect, that Detective Prieto did not "get a search warrant on Eric Dawkins' home" and "doesn't get a lineup for the victims to identify [Dawkins as] the suspect." (*Id.* at 8.) Rather, according to Slaughter's trial counsel, Detective Prieto merely called Dawkins, asked where he was at the time of the robbery, and called Dawkins's grandmother to confirm Dawkins's whereabouts. (*Id.*)

### 2.    Analysis

"[I]t may violate *Strickland* for counsel to promise evidence in an opening statement and then fail to present that evidence at trial." *Mann v. Ryan*, 828 F.3d 1143, 1154 (9th Cir. 2016). The first consideration is whether a promise has been made: "[a] promise creates expectation: did the counsel say that the testimony *will* happen, and did he present such testimony as supportive of his theory?" *Saesee v. McDonald*, 725 F.3d 1045, 1050 (9th Cir. 2013) (emphasis in original). The second consideration, prejudice, is premised on broken trust: "A juror's impression is fragile. It is shaped by his confidence in counsel's integrity. . . . By failing to present promised testimony, counsel has broken a pact . . . in which

29

the juror promises to keep an open mind in return for the counsel's submission of proof." *Id.* at 1049 (internal quotation marks omitted). Consequently, "in some cases—particularly cases where the promised witness was key to the defense theory of the case and where the witness's absence goes unexplained—a counsel's broken promise to produce the witness may result in prejudice to the defendant." *Id.* at 1049–50.

Here, this Court finds that Slaughter fails to demonstrate ineffectiveness. First, regarding Westbrook and Slaughter's alibi in general, it is true that Slaughter's trial counsel's opening argument promising a solid alibi failed to come to fruition. In fact, Slaughter's trial counsel promised to provide for Slaughter's whereabouts for the entire time frame around the robbery, but the trial evidence instead showed an unclear picture of Slaughter's whereabouts prior to the robbery and gaps in Slaughter's whereabouts at the time he was picking up Johnson from work. This added up to a flimsy alibi. That being said, this Court cannot conclude that the jury held this not-quite-fulfilled promise against Slaughter's trial counsel or against Slaughter. Instead, it appears that the jury was aware that Slaughter's trial counsel attempted to fulfill his promise but merely fell short in doing so. As such, this Court does not find that Slaughter demonstrates prejudice under *Strickland*.

Next, regarding Waddy and Detective Prieto, Slaughter's trial counsel never promised that they would testify. Slaughter's trial counsel prefaced his comments about Waddy with "[i]f she's going to testify." And his comments about Detective Prieto merely discussed Detective Prieto's investigative efforts surrounding Dawkins, Slaughter's alternate suspect. Slaughter's trial counsel never said that Detective Prieto would be testifying. Rather, Slaughter's trial counsel presented the testimony of Winters to support any implied promises about presenting Dawkins as an alternate suspect.

Because Slaughter's ineffective assistance of trial counsel claim is not

substantial due to his failure to demonstrate ineffectiveness under *Strickland*, he fails to overcome the procedural default of ground 5. Ground 5 is dismissed.

### F.    Ground 6

In ground 6, Slaughter alleges that his trial counsel failed to object to various prosecutorial misconduct, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 46.) Specifically, Slaughter alleges that the prosecutor inappropriately (a) suggested he had attempted to fake a Jamaican accent, (b) said there was "no question" he "put a gun to" Young's "face," (c) vouched for Arbuckle, (d) suggested Slaughter knew the time of the crime, so he must have been there, (e) suggested his use of an alibi defense illustrated his guilt, (f) stated, "You shoot a guy in the face, you don't just get 10 years," and (g) told the jury, "If you are doing the job," it will convict. (*Id.* at 46–50.) This Court previously determined that this ground is procedurally defaulted and deferred a determination of prejudice under *Martinez* to overcome this default until merits review. (ECF No. 116 at 24–25.)

### 1.    Background information

During the prosecution's initial closing argument, the prosecutor told the jury the suspects "used fake accents." (ECF No. 23-4 at 6.) The prosecutor then elaborated: "Ivan Young said it appeared that they were trying to talk Jamaican. Ryan John said it sounded like a fake accent; and Jennifer said it sounded like they were putting on an act" by "using a different voice to disguise their identity." (*Id.*)

Later, during rebuttal argument, in response to the defense having conceded that the crimes occurred but arguing that the police got the wrong man, the prosecutor stated, "[t]he real question, the question about it is, this man put a 357 to a guy's face that he shot. There is no question about that." (*Id.* at 35.) Soon after, the prosecution, in response to the defense's statements about Johnson's testimony, stated that the jury did not have to find her credible, saying

"[w]e didn't call" her, and that "I think you should believe Mr. Arbuckle, who has no reason to lie." (*Id.*)

Then, still during rebuttal argument, the prosecution noted that Slaughter "is booked in at 1:33, and at 1:45 in the morning he calls his girlfriend; the first call, he asked her what happened. What does she say; I told them you picked me up at 7:30." (*Id.* at 37.) Slaughter then tells his girlfriend "[y]ou got to tell them 7 or I am going to prison for life." (*Id.*) The prosecutor then rhetorically asked, "[m]y question to you is, from the evidence you have heard here, how does he know he needs to alibi himself for 7:30 at night. How does he know that fact that that's when the crime occurred. Ask yourself that question." (*Id.* at 37–38.) The prosecutor next remarked, "[i]f he had not been doing something wrong at 7:00 o'clock at night, he wouldn't need anybody to come in here and lie for him. That alone would make him guilty." (*Id.* at 38.)

Next, the prosecutor noted that Slaughter stated on a jail phone call that he "might go to trial if they are going to keep at 18 to life, but if they offer [him] a plea of 8 to 9 years, [he] might take it." (*Id.*) The prosecutor then stated, "[g]uilty people don't, in the first week say, you know what, I am going to go do the next decade of my life in jail for something I didn't do" and "I got to tell Mr. Slaughter this, too, you shoot a guy in the face, you don't just get 10 years." (*Id.*)

Finally, at the closing of his rebuttal argument, the prosecutor stated, "[t]here isn't any question who robbed, who terrorized, who kidnapped, who brutalized this family. There's at least one person in this room that knows beyond any shadow of a doubt who committed this crime." (*Id.* at 40.) The prosecutor "suggest[ed]" to the jury, "if you are doing the job, 12 of you will go back in that room, you will talk about it and come back here and tell him you know, too." (*Id.*)

### 2.    Analysis

Slaughter fails to demonstrate his counsel was ineffective regarding each of the statements because (1) the prosecutor's statements failed to rise to the level

of being improper or (2) there is not a reasonable probability that the jury would have reached a different verdict had the trial court sustained an objection by Slaughter's trial counsel. *See generally Zapata v. Vasquez*, 788 F.3d 1106, 1116 (9th Cir. 2015) ("Defense counsel's failure to object to th[e] egregious misconduct [during closing argument] therefore fell below an objective standard of reasonableness." (internal quotation marks omitted)).

First, regarding the prosecutor's comment about the fake accents, Slaughter argues that none of the witnesses said anything about the accents being fake, except perhaps Young's wife, who said she did not know whether the accents were authentic; thus, the prosecutor misrepresented the evidence. (ECF No. 91 at 48.) By including Young and John in this statement about the victims saying the suspects used faked accents, the prosecutor misrepresented the evidence. As such, it would have been prudent for Slaughter's trial counsel to have objected. However, Slaughter fails to show prejudice. The jury was instructed that "[s]tatements, arguments and opinions of counsel are not evidence in this case." (ECF No. 23-3 at 40.) Rather, the jury was instructed that "[t]he evidence which you are to consider in this case consists of the testimony of the witnesses, the exhibits, and any facts admitted or agreed to by counsel." (*Id.*) "A habeas court must presume that jurors follow the jury instructions." *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir. 2011). Accordingly, because the jurors heard the testimony of Young and John and were instructed to rely on that testimony instead of the statements of counsel, Slaughter fails to demonstrate that the jury would have found him innocent had his trial counsel objected. *See Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt).

Second, regarding the prosecutor's argument about there being no

question that Slaughter was the one who held the gun to Young's face, Slaughter argues that this was the key question for the jury to resolve and amounted to the prosecution arguing their own personal views of the evidence. (ECF Nos. 91 at 48, 140 at 143.) While "prosecutor[s] must refrain from interjecting personal beliefs into the presentation of [the] case," *United States v. Young*, 470 U.S. 1, 8–9 (1985), they may argue about inferences from the evidence and give conclusions on contested issues. Given that the prosecution's stance was that Slaughter was the culprit, the argument that there was "no question" that Slaughter was the one who held the gun to Young's face was merely the prosecution offering its conclusion on the contested issue of the culprit's identity. This does not amount to misconduct, negating any argument that Slaughter's trial counsel should have objected.

Third, regarding the prosecutor's argument about the jury not needing to find Johnson credible and to find Arbuckle credible instead, Slaughter argues that this amounted to improper vouching. (ECF No. 91 at 48.) "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). Here, the prosecutor simply contended that one witnesses should be believed over another. The prosecutor did not personally assure Arbuckle's veracity or suggest that it had extra-record facts supporting his testimony. This was proper. *See id.* at 1279 ("The prosecutor here argued that [the witness] told the truth because, if she were lying, she would have done a better job. This is simply an inference from evidence in the record. It is not . . . a reference to extra-record facts or a personal guarantee of [the witness]'s veracity. The prosecutor merely argued that [the witness] was telling the truth, an argument the prosecutor had to make in order to convict [the defendant]. These statements do not imply that the government is assuring [the witness]'s veracity,

34

and do not reflect the prosecutor's personal beliefs."). Given the lack of misconduct, there was no meritorious basis for Slaughter's trial counsel to have objected.

Fourth, regarding the prosecutor's argument about how Slaughter would not have known he needed an alibi for 7:00 if he was not the culprit, Slaughter argues that Detective Prieto had discussed the timing of the robbery with him soon after his arrest, making the prosecutor's insinuation that he made up an alibi improper. (ECF No. 91 at 49.) A prosecutor is permitted to make "reasonable inferences that could be drawn from the evidence." *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000). The inference that Slaughter was attempting to manufacturer an alibi by telling Johnson on the jail phone call what time he picked her up from work on the night of the robbery was reasonable under the circumstances. This was not misconduct.

Fifth, regarding the prosecutor's statement about Slaughter not needing witnesses to lie for him if he had a real alibi, Slaughter again argues that the prosecutor inappropriately suggested that he had manufactured an alibi. (ECF No. 91 at 49.) This Court reads the prosecutor's statement as criticism of Slaughter's alibi defense, which is permissible. *See United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument."). Therefore, Slaughter fails to demonstrate any misconduct.

Sixth, regarding the prosecutor stating that "you don't just get 10 years" for shooting someone in the face in response to Slaughter stating he would be open to taking a guilty plea, Slaughter argues that the prosecutor's comment was flagrant commentary. (ECF No. 91 at 50.) This statement was arguably meant to be inflammatory. *See United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) (explaining that prosecutors have been "consistently cautioned against [making] prosecutorial statements designed to appeal to the passions, fears and

vulnerabilities of the jury"); *see also United States v. Nobari*, 574 F.3d 1065, 1077 (9th Cir. 2009) (finding that "[t]he prosecution's comment was an improper appeal to jurors' emotions and fears"). However, this statement was isolated, making any prejudice negligible. *See Sassounian v. Roe*, 230 F.3d 1097, 1107 (9th Cir. 2000) (determining, in part, that the petitioner was not denied a fair trial due to prosecutorial misconduct because "the misconduct was isolated").

Seventh, regarding the prosecutor's statement about the jury doing their job if they find Slaughter guilty, Slaughter argues that the prosecutor improperly told the jury it had a duty to reach a guilty verdict. (ECF No. 91 at 50.) While this statement was improper, Slaughter fails to demonstrate that this singular statement influenced the jury's verdict. *See United States v. Young*, 470 U.S. 1, 18 (1985) (stating that "[t]he prosecutor was . . . in error to try to exhort the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice," but determining that "the jury was not influenced to stray from its responsibility to be fair and unbiased"); *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 988 (9th Cir. 2020) (stating that "it is 'improper for the prosecutor to state that the duty of the jury is to find the defendant guilty,'" but concluding that "in the context of both attorneys' arguments, the district court's directive to follow the instructions, the jury instructions themselves, and the government's statement at other times during the argument that the jury must weigh all of the evidence to reach its conclusion, these statements do not warrant reversal").

In sum, Slaughter's ineffective assistance of trial counsel claim is not substantial because he fails to demonstrate ineffectiveness under *Strickland*, so he fails to overcome the procedural default of ground 6. Ground 6 is dismissed.

### G.    Ground 7

In ground 7, Slaughter alleges that the State committed prosecutorial misconduct during closing arguments, in violation of his rights under the Fifth,

Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 50.) Specifically, like ground 6, Slaughter alleges that the prosecutor inappropriately (a) suggested he had attempted to fake a Jamaican accent, (b) said there was "no question" he "put a gun to" Young's "face," (c) vouched for Arbuckle, (d) suggested Slaughter knew the time of the crime, so he must have been there, (e) suggested Slaughter's use of an alibi defense illustrated his guilt, (f) stated, "You shoot a guy in the face, you don't just get 10 years," and (g) told the jury, "If you are doing the job," it will convict. (*Id.* at 50–51.)

This Court previously found that grounds 7a, 7b, 7c, and 7d are procedurally defaulted. (ECF No. 116 at 24.) Slaughter argued that his trial counsel ineffectiveness allegations in ground 6 excuse the default of their corresponding substantive claims in ground 7. (ECF No. 112 at 25.) This Court deferred a consideration of this argument until merits review. (ECF No. 116 at 26.) When a constitutional claim is procedurally defaulted, and the petitioner tries to demonstrate cause by claiming ineffective assistance of counsel, the claim of ineffective assistance of counsel must not be procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). Here, this Court dismissed ground 6 as procedurally defaulted, so ground 6 cannot be used as cause to excuse the procedural default of grounds 7a, 7b, 7c, and 7d. As such, grounds 7a, 7b, 7c, and 7d are dismissed, and this Court considers only grounds 7e, 7f, and 7g.

### 1. State court determination

In affirming Slaughter's Judgment of Conviction, the Nevada Supreme Court held:

> Finally, appellant argues that the prosecutor engaged in several instances of misconduct. Because appellant did not object to any of the comments he challenges, his claim is reviewed for plain error affecting his substantial rights. *See Valdez v. State,* 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008). For the following reasons, we conclude that appellant has not established plain error. . . . Third, appellant argues that the prosecutor improperly shifted the burden of proof by commenting that if appellant was not doing anything wrong at the time of the crimes, "he wouldn't need anybody to come

37

in here and lie for him. That alone would make him guilty." Considering the challenged comment in context, *see Hernandez v. State*, 118 Nev. 513, 525, 50 P.3d 1100, 1108 (2002), we conclude that the prosecutor's comments were a permissible response to evidence appellant presented suggesting that he was elsewhere at time the crimes were committed. Fourth, appellant contends that the prosecutor improperly interjected his personal beliefs to inflame the jury by stating, "I got to tell Appellant this, too, you shoot a guy in the face, you don't just get 10 years." *See Aesoph v. State*, 102 Nev. 316, 322, 721 P.2d 379, 383 (1986) ("[P]rosecutors must not inject their personal beliefs and opinions into their arguments to the jury."). To the extent that the comment may be construed as personal opinion, no relief is warranted given the evidence presented. Fifth, appellant contends that the prosecutor's comment that appellant knew he committed the crimes and suggested to the jury that "if you are doing the job, 12 of you will go back in that room, you will talk about it, and come back here and tell him you know, too," suggested to the jury that it had a duty to convict him. To the extent that the comment may be deemed improper, *see Anderson v. State,* 121 Nev. 511, 517, 118 P.3d 184, 187-88 (2005), no relief is warranted considering the evidence presented.

(ECF No. 26-7 at 5–7.)

## 2. Standard

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, this Court looks to various factors: "the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation and whether defense counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113

38

(9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

### 3. Analysis

In ground 7e, wherein Slaughter alleges that the prosecutor inappropriately suggested that his use of an alibi defense illustrated his guilt, the Nevada Court reasonably determined that the prosecutor's statement was a permissible response to evidence Slaughter presented at trial. Indeed, as this Court discussed in ground 6e, the prosecutor's statements, when read in context, attacked Slaughter's weak alibi defense at trial. This type of attack is not only permissible, but it is expected.

In ground 7f, wherein Slaughter alleges that the prosecutor inappropriately stated, "You shoot a guy in the face, you don't just get 10 years," the Nevada Supreme Court reasonably determined that, to the extent that the statement may be construed as a personal opinion, no relief is warranted given the evidence presented at trial. As this Court discussed in ground 6f, even if the prosecutor's statement was improper, any prejudice was negligible.

In ground 7g, wherein Slaughter alleges that the prosecutor inappropriately stated to the jury, "If you are doing the job," it will convict, the Nevada Supreme Court reasonably determined that, to the extent that the comment may be deemed improper, no relief is warranted considering the evidence presented. As this Court discussed in ground 6g, Slaughter fails to demonstrate that this statement, even if improper, infected the trial with unfairness.

Because the Nevada Supreme Court's determination denying relief on grounds 7e, 7f, and 7g constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts, Slaughter is not entitled to federal habeas relief on grounds 7e, 7f, and 7g.

### H.    Ground 9

In ground 9, Slaughter alleges that his appellate counsel failed to raise

39

meritorious issues during direct appeal, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 52.) Specifically, Slaughter alleges that his direct appeal counsel failed to (a) litigate a *Batson* challenge, and (b) litigate the State's failure to preserve the second photographic lineup. (*Id.* at 52–54.)

### 1.    Standard

The *Strickland* standard is also utilized to review appellate counsel's actions. A petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). A petitioner must then show "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Id.*

### 2.    State court determination

In affirming the denial of his first state habeas petition, the Nevada Supreme Court held:

> Slaughter claimed that appellate counsel was ineffective for (1) failing to raise a *Batson* claim and (2) challenge the State's failure to preserve evidence. We conclude that the district court did not err by denying these claims because Slaughter failed to demonstrate that they had a reasonable probability of success on appeal. *See Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996) (applying *Strickland* to appellate counsel).

(ECF No. 27-13 at 3 n.1.)

### 3.    Ground 9a—*Batson*

In ground 9a, Slaughter alleges that his direct appeal counsel failed to litigate a *Batson* challenge because the prosecution used a peremptory challenge to strike the last remaining African American in the venire, Juror No. 242. (ECF No. 91 at 52–53.)

#### 1.    Background information

During voir dire, Juror No. 242 stated that she "feel[s] like [she] ha[s] to teach [her two black kids] . . . how to react or act when a police officer pulls them

over" to make sure they know "how to survive that." (ECF No. 20-2 at 4.) Juror No. 242's statements in this regard dealt with her personal experiences of being a passenger in a vehicle being driven by a black man and a police officer pulling that vehicle over when they "weren't doing anything but driving around." (*Id.*) In response to the prosecutor's follow-up questions, Juror No. 242 stated that she believed "there's good people and bad people in all professions," that her experiences "would [not] play too much of a part in" her determination of the facts of this case because "[i]t is a separate case," she would "be able to listen to the testimony of an officer with a clear mind and apply that to the law in this case to come to a verdict," and she "could be fair and impartial." (*Id.* at 4–6.)

The prosecutor attempted to challenge Juror No. 242 for cause, explaining that he "never heard a juror say and I quote, 'I need to teach my children how to survive when they come into contact with the police.'" (*Id.* at 33–34.) The prosecutor stated that this "clearly indicates a bias against law enforcement." (*Id.* at 34.) The trial court denied the challenge for cause, stating that Juror No. 242 merely stated that she "chose to talk to [her] young sons about when, not if they get pulled over." (*Id.* at 37.) According to the trial court, this proactive raising of her boys "doesn't mean that [she] cannot judge what happened in this particular case." (*Id.* at 38.)

Later, following peremptory challenges, Slaughter's trial counsel noted on the record that "the State has exercised their preemptory challenges in a way that basically limits the racial make-up of the jury" given that "[a] substantial portion of their preemptory challenges were based specifically on minorities." (ECF No. 20-3 at 3.) The trial court asked the prosecution to "make the record as to [Juror No. 242], the African-American young lady." (*Id.* at 5.) The prosecutor responded, "[t]he same reason I challenged her for cause," explaining that he saw Juror No. 242 "nod along with [another juror] as he was saying some fairly preferential things concerning the behavior of police officers, and what he believed those

police officers could do." (*Id.* at 6.) When Juror No. 242 was asked about this, she indicated that she "ha[s] to tell [her] children, explain to [her] children how to survive when they come into contact with a police officer." (*Id.*) The prosecutor then argued that "need[ing] to think about surviving" around a police officer equates to "an inherent distrust of police," which translates to an individual who is "less likely to convict." (*Id.*) The trial court then ruled, "I think the reasoning behind striking [Juror No. 242] is more than adequate to justify her exclusion." (*Id.* at 7.)

Slaughter's appellate counsel indicated to Slaughter that they "d[id] not feel that it [was] in [Slaughter's] best interest to bring [a] *Batson*" claim because (1) the preempted jurors were "not members of [his] race" and (2) bringing this claim "will hurt the credibility of the solid claims." (ECF No. 26-14 at 80–81.)

### 2.    *Batson* standard

To determine whether appellate counsel's failure to raise a *Batson* claim on direct appeal was objectively unreasonable and prejudicial, this Court must first assess the merits of the *Batson* claim. *See Moormann v. Ryan*, 628 F.3d 1102, 1106–07 (9th Cir. 2010); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal."); *Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir.1997) ("A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court.").

The use of a peremptory challenge to remove a prospective juror because of race violates the federal constitution. *See J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 129 (1994); *Powers v. Ohio*, 499 U.S. 400, 409 (1991). Under *Batson v. Kentucky* and its progeny, consideration of a defendant's challenge to a peremptory strike involves a three-step analysis: (1) "the trial court must

determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race," (2) "if the showing is made, the burden shifts to the prosecution to present a race-neutral explanation for striking the juror in question," and (3) "the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Rice v. Collins*, 546 U.S. 333, 338 (2006).

Defendants may present the following factors to establish step one: (1) "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case," (2) "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case," (3) "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case," (4) "a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing," (5) "relevant history of the State's peremptory strikes in past cases," or (6) "other relevant circumstances that bear upon the issue of racial discrimination." *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019). "[T]he critical question in determining whether a [petitioner] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell*, 537 U.S. 322, 338–39 (2003). This issue comes down to credibility, and "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339.

### 3. Analysis

The Nevada Supreme Court reasonably determined that Slaughter failed to demonstrate that his *Batson* claim had a reasonable probability of success on appeal. Because the trial court requested that the prosecution explain why they used a peremptory challenge on Juror No. 242, it is assumed that the trial court

found that the first step had been met, *i.e.,* that Slaughter made a prima facie showing that the prosecutor exercised the peremptory challenge on the basis of race. Next, the prosecution provided a race-neutral explanation for striking Juror No. 242: she stated a general distrust for police officers regarding their interactions with black men. (ECF No. 20-2 at 4.) Slaughter argues that the trial court erred in the final *Batson* step: determining whether he carried his burden of proving purposeful discrimination. Although Slaughter alleges that the prosecution's explanation for exercising a peremptory challenge on Juror No. 242 was pretextual (*see* ECF No. 91 at 53), it was reasonable for the prosecution to not have wanted Juror No. 242 to be on the jury given her beliefs—however slight—that showed anti-law enforcement sentiment. This belies a finding that the trial court erred in overruling Slaughter's challenge, meaning that Slaughter fails to demonstrate that he would have prevailed on appeal had his appellate counsel included this claim.[9] Consequently, because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland, Smith,* and *Batson* and was not based on an unreasonable determination of the facts, Slaughter is not entitled to federal habeas relief for ground 9a.

### 4.    Ground 9b—preservation of evidence

In ground 9a, Slaughter alleges that his direct appeal counsel failed to litigate the prosecution's failure to preserve the second photographic lineup. (ECF No. 91 at 53.) As was discussed in ground 3a, a second photo lineup was created for the identification of the second robber. (*See* ECF No. 18 at 7.) That photo

---

[9] Notably, Slaughter's appellate counsel's misguided reasoning for not including this claim in Slaughter's direct appeal amounts to deficient representation given that Slaughter's *Batson* claim was colorable and worthy of review by the Nevada Supreme Court. However, given that deference is owed to the trial court's decision to overrule the *Batson* objection, meaning Slaughter fails to meet *Strickland*'s prejudice prong, the issue of Slaughter's appellate counsel's erroneous analysis of this issue under *Strickland*'s performance prong need not be discussed further.

lineup included the second suspect, but it also mistakenly contained a photo of Slaughter. (*Id.*) Slaughter argues that the police failed to keep proper records of this photo lineup, including who was involved in its creation, who was shown it and when, and what the victims said in response to the lineup. (ECF No. 91 at 53.)

Slaughter's trial counsel moved to dismiss this case based on this preservation failure. (ECF No. 18.) The trial court denied the motion, stating that "you can ask questions about it." (ECF No. 18-13 at 11.) According to the trial court, this was not "a failure to preserve or destroy evidence" issue but rather a "sloppy bookkeeping by the police" issue, "which . . . is often times a line of questioning you pursue at trial" during cross-examination. (*Id.* at 11–12.)

The prosecution's loss or destruction of potentially exculpatory evidence violates due process only when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). Moreover, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*. Negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and does not violate due process. *See id.* at 58; *see also United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

The Nevada Supreme Court reasonably determined that Slaughter failed to demonstrate that this claim had a reasonable probability of success on appeal.

Given that Detective Prieto did not even realize that Slaughter was in the second photo lineup, Slaughter fails to demonstrate that the police acted with bad faith in not preserving records of this photo lineup. Indeed, if they were unaware that the lineup contained Slaughter, they were also likely unaware that information surrounding that lineup was connected to Slaughter's case and thus needed to be preserved. Because it appears that the police acted with negligence—not bad faith—regarding the second photo lineup, Slaughter fails to demonstrate that his appellate counsel was ineffective for not raising this claim on direct appeal. Because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland* and *Youngblood* and was not based on an unreasonable determination of the facts, Slaughter is not entitled to federal habeas relief for ground 9b.

## I.    Ground 10

In ground 10, Slaughter alleges that the prosecutors exercised a racially motivated peremptory challenge, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 54.) This Court previously found that ground 10 is procedurally defaulted. (ECF No. 116 at 24.) Slaughter argued that his appellate counsel ineffectiveness allegation in ground 9a excuses the default of the corresponding substantive claim in ground 10. (ECF No. 112 at 25.) This Court deferred ruling on whether ground 10 is procedural barred until after (1) the filing of an answer and reply and (2) determining in ground 9a whether Slaughter's appellate counsel was ineffective in failing to raise the underlying substantive claim. (ECF No. 116 at 26 (citing *Cockett v. Ray*, 333 F.3d 938, 943–44 (9th Cir. 2003) (holding that the ineffective assistance of appellate counsel in failing to raise a claim on direct appeal in the state criminal proceedings may potentially establish cause to overcome a procedural default).) Here, this Court denied ground 9a, determining that the Nevada Supreme Court reasonably concluded that Slaughter's appellate

46

counsel was not ineffective in failing to raise a *Batson* claim in his direct appeal. As such, ground 9a cannot be used as cause to excuse the procedural default of ground 10. Ground 10 is dismissed.

### J.    Ground 11

In ground 11, Slaughter alleges that the prosecutors failed to disclose material exculpatory information, made relevant misrepresentations in open court, and failed to correct false testimony, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 91 at 55.) Specifically, Slaughter alleges that (a) the prosecutor did not disclose evidence regarding Means's 911 call and misrepresented the timing, (b) the prosecution failed to turn over information about the second photo lineup and misrepresented its outcome, and (c) the prosecution failed to turn over impeachment information about Arbuckle. (*Id.* at 55–67.)

### 1.    State court determination

In affirming the denial of Slaughter's second state habeas petition, the Nevada Supreme Court considered Slaughter's *Brady* arguments to determine whether he could demonstrate good cause and prejudice to overcome Nevada's procedural bars and concluded that Slaughter failed to show that the State withheld each of the three items alleged in this ground and failed to show materiality regarding the first two items:

> Appellant argues he demonstrated good cause and prejudice sufficient to excuse the procedural bars because the State withheld three pieces of material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). There are three components to a successful *Brady* claim: "the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material." *Mazzan v. Warden*, 116 Nev. 48, 67, 993 P.2d 25, 37 (2000). Evidence is material only when there is a reasonable probability or possibility—depending on whether there was a specific request for the evidence—that the result of the trial would have been different. *Id.* at 74, 993 P.2d at 41; *see also Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("[S]trictly speaking, there is never a real '*Brady* violation' unless the [Government's] nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have

47

produced a different verdict."); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (internal quotation marks omitted)).

When a *Brady* claim is raised in the context of a procedurally-barred postconviction petition, the petitioner has the burden of demonstrating good cause for his failure to present the claim earlier and actual prejudice. *State v. Bennett*, 119 Nev. 589, 599, 81 P.3d 1, 8 (2003). As a general rule, "[g]ood cause and prejudice parallel the second and third *Brady* components; in other words, proving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice." *Id.* Additionally "a *Brady* claim still must be raised within a reasonable time after the withheld evidence was disclosed to or discovered by the defense." *State v. Huebler*, 128 Nev. 192, 198 n.3, 275 P.3d 91, 95 n.3 (2012). Our review is de novo. *See Bennett*, 119 Nev. at 599, 81 P.3d at 7–8 (reviewing de novo a *Brady* claim in a procedurally-barred petition).

First, appellate asserts the State withheld the outcome of a second photographic lineup—that none of the victims identified him in the second lineup. A photographic lineup was created for appellate, and four of the victims recognized appellant. A second photographic lineup, which inadvertently included a different picture of appellant than the picture in the first lineup, was created for an alleged accomplice. While he always suspected none of the victims identified him in the second photographic lineup, appellant claims that he did not have proof of this fact until he deposed the detective in 2018. During the deposition, the detective said that he would never intentionally include two suspects in the same lineup, that the victims did not identify anyone in the second lineup, and that, consequently, the victims did not fill out anything or write anything down regarding the second lineup.

Appellate fails to show that the State withheld material evidence related to the second photographic lineup. Before trial, appellant was provided with copies of the second photographic lineup and knew that he was in the lineup. Before and during trial, appellant argued to the district court that there was no notation or indication of his being identified. The outcome of the second lineup was therefore not withheld as appellant acknowledged during the pretrial hearings that there was no record of his being identified. But even assuming the outcome of the second lineup was withheld, appellant fails to show the materiality of the victims' inability to identify him in the second photographic lineup created for the alleged accomplice considering the other evidence against appellant, including in-court identifications by three of the victims, surveillance video showing appellant using a victim's ATM card shortly after the incident, *see Slaughter v. State*, Docket No. 61991, Order of Affirmance, at 3 (March 12, 2014) (giving deference to the district court's factual finding that appellant was depicted in the surveillance footage), and the fact that appellant's girlfriend owned a vehicle, to which appellant had access, resembling the witnesses' descriptions and containing "two firearms consistent with those used in the crimes and ammunition consistent with ballistic evidence recovered from the scene," *id.* at 2–3. Based on this evidence, appellant has not demonstrated a reasonable possibility that the result of trial would

have been different had the outcome of the second lineup been disclosed. Therefore, the district court did not err in denying this claim as procedurally barred.

Second, appellant asserts the State withheld material evidence confirming the time of the 9-1-1 call. While acknowledging the State disclosed police reports referencing 7:11 p.m. in connection with the incident and the dispatch of officers, appellant claims that he had no explanation for what the time meant and that nothing explicitly stated the call time was 7:11 p.m. until he received a document in 2018. He claims this evidence would have shown the perpetrators left the scene at approximately 7:08 p.m., a fact he alleges was crucial to his alibi defense.

Appellant fails to show that the State withheld material evidence related to the time of the 9-1-1 call. Appellant was aware from police reports that at or about 7:11 p.m. officers were dispatched in reference to the incident. "Evidence is not suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United State v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (internal citations and quotation marks omitted); *see also United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990); *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *United States v. Stuart*, 150 F.3d 935, 937 (8th Cir. 1998); *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983); *People v. Superior Court (Johnson)*, 377 P.3d 847, 858–59 (Cal. 2015); *State v. Bisner*, 37 P.3d 1073, 1082–83 (Utah 2001); *State v. Mullen*, 259 P.3d 158, 166 (Wash. 2011). And this court has recognized, "a *Brady* violation does not result if the defendant, exercising reasonable diligence, could have obtained the information." *Rippo v. State*, 113 Nev. 1239, 1257, 946 P.2d 1017, 1028 (1997) (listing federal cases holding the same); *see also United States v. Aichele*, 941 F.2d 761, 764 (9th Cir, 1991) ("When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government."); *Mass v. Quarterman*, 446 F.Supp.2d 671, 693 (W.D. Tex. 2006) (noting that "*Brady* imposes a duty of disclosure with regard to [exculpatory] *information*, regardless of what form that information might assume" and finding no *Brady* violation where specific reports were not disclosed but the substantive information from the reports was known by the defense).

Even assuming that confirmation of the 9-1-1 call time was withheld, appellant fails to show the materiality. While appellant relies on testimony from his girlfriend that he was picking her up ten miles away from the scene of the crime between 7:00 p.m. to 7:15 p.m. but no later than 7:20 p.m. in order to demonstrate materiality, the jury also heard about a prior statement by the girlfriend and testimony of another witness that appellant picked his girlfriend up at 7:30 p.m. Moreover, the jury heard evidence that appellant attempted to fabricate his alibi on a phone call with his girlfriend. *See Slaughter v. State*, Docket No. 68532, Order of Affirmance, at 3 (July 13, 2016) (referencing the district court's finding that appellant made statements which indicated he was attempting to fabricate an alibi). Lastly, as noted above, appellant was identified in court by three of the victims and video surveillance showed him using one of the victim's ATM cards shortly after the incident. Considering all of the above, appellant failed to demonstrate a reasonable probability

that the result of the trial would have been different had a document confirming the 7:11 p.m. call time been disclosed.

Third, appellant asserts the State withheld material impeachment evidence. He claims the evidence demonstrates that Jeffrey Arbuckle, a witness for the State, was biased against appellant based on the fact that Arbuckle called the police on appellant for trespassing approximately three weeks before the incident. Appellant fails to show that he raised this claim within a reasonable time after the allegedly withheld evidence was disclosed to or discovered by the defense. In his first postconviction petition, filed in 2015, appellant wrote: "In response to the verbal argument between [appellant] and Arbuckle, Arbuckle appears to have filed a police report or claim with the police on 06/03/2004, requesting that [appellant] be 'trespassed' from [the premise]. I personally discovered this information after trial, after receiving [defense counsel's] case file regarding my case and reviewing a 'print-out' of my S.C.O.P.E. record which was contained in [defense counsel's] personal trial file." Because information about the trespass was included in trial counsel's folder, it does not appear that it was withheld by the State. Further, because appellant was aware of the underlying facts of this claim in 2015, he has not shown good cause for litigating the claim again in his 2018 petition. Therefore, the district court did not err in concluding that appellant has not demonstrated good cause or actual prejudice to excuse the procedural bars based on the alleged *Brady* violations.

(ECF No. 84-26 at 3–8.)

### 2.    *Brady* standard

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Because a witness's "'reliability . . . may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. *Hovey v. Ayers*,

458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Accordingly, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678). Importantly, "suppressed evidence [must be] considered collectively, not item by item." *Id.* at 436.

### 3.      Section 2254 standard of review

Slaughter first contends that because (1) 28 U.S.C. § 2254(d) applies only when the state court "adjudicated" a claim "on the merits," and (2) the Nevada Supreme Court rejected his *Brady* claim for procedural reasons, de novo review is warranted. (ECF No. 140 at 183–84.) The Ninth Circuit has explained that "in the context of *Brady* claims, the merits of the claim dovetail exactly with the cause-and-prejudice analysis." *Cooper v. Neven*, 641 F.3d 322, 333 (9th Cir. 2011). Thus, "[i]n holding that the state procedural bars applied to [Petitioner]'s claim, the Nevada state court therefore necessarily rested its analysis on the merits of the federal *Brady* claim." *Nitschke v. Belleque*, 680 F.3d 1105, 1110–11 (9th Cir. 2012). Accordingly, because the Nevada Supreme Court was inherently required to consider the merits of Slaughter's *Brady* claim before turning to the decision of whether Nevada procedural rules applied, this Court finds that the Nevada Supreme court adjudicated this ground on the merits.

Slaughter next contends that the Nevada Supreme Court failed to consider the cumulative prejudice arising from the prosecution's suppression of the evidence in compliance with *Kyles*, so this Court can review this ground de novo.

(ECF No. 140 at 186.) Slaughter is correct that the Nevada Supreme Court did not conduct a cumulative prejudice analysis. However, it was not required to do so. The Nevada Supreme Court found that the prosecution did not withhold evidence related to the second photographic lineup, the time of the 911 call, or the trespassing police report. Consequently, given that (1) the issue of the withholding of the evidence was the basis for denying relief, and (2) a *Brady* violation only occurs if all three components—favorability, suppression, and prejudice—are present, a cumulative prejudice analysis was unnecessary.

Slaughter then contends that the Nevada Supreme Court's decision was based on an unreasonable determination of the facts. (ECF No. 140 at 198.) First, the Nevada Supreme Court held that there was no suppression regarding the second photo lineup because Slaughter "acknowledged during the pretrial hearings that there was no record of his being identified." This is a distorted version of the facts. Slaughter having "no record of his being identified" in the second lineup is the starting point, not the end point, of the suppression analysis. At the pretrial hearing, the defense sought details needed to confirm that no witness identified Slaughter in the second lineup:

> these photographic lineups were *apparently* shown to some or all of the alleged victims by whom, I'm not sure, when, I'm not sure, and what were the results, I'm not sure. Okay. So it's a failure to record the showing of these photographic lineups to whomever they were shown to. All the information we have is that the client wasn't identified when these photo lineups were shown to the victims. . . . The problem is I don't know when they were shown, I don't know what officer or representative of law enforcement showed them to witnesses, and we don't know what the results were, aside from our client *apparently* wasn't identified.

(ECF No. 18-13 at 8–9 (emphases added).) Surmising that Slaughter was "apparently" not identified is not the same as knowing this fact to be definitively true. The Nevada Supreme Court's conclusion that there was no suppression was unreasonable because the record shows that this fact was precisely what the

prosecution suppressed.

Slaughter's trial counsel attempted before trial to get unequivocal confirmation from the prosecution that Slaughter was unquestionably not identified in that second photo lineup, which information would have permitted Slaughter's trial counsel to cross-examine and impeach the witnesses about their identifications of Slaughter before and at trial. As discussed below, however, trial counsel's effort to get this information (the fact that no witness identified Slaughter in the second lineup) was rebuffed. The evidence was not disclosed upon request and the prosecution instead stated at the pretrial hearing that Slaughter was taking a giant leap to say he was not identified in the second photo lineup. It is unclear how Slaughter could have "acknowledged during the pretrial hearings that there was no record of his being identified" when the prosecutor—the ultimate bearer of that information—implied at those very same hearings that Slaughter had been identified. In light of the prosecutor's suggestion that one or more witnesses identified Slaughter in the second lineup, Slaughter's trial counsel would have taken a significant risk in cross-examining the witnesses at trial about their "apparent" lack of identification of Slaughter in the second photo lineup.

Moreover, the Nevada Supreme Court held that Slaughter was aware from police reports that at or about 7:11 p.m. officers were dispatched in reference to the incident, so nothing was withheld. This finding is not supported by the record. As will be discussed below, Slaughter attempted to argue at trial that the 911 call was placed at 7:11 p.m., but the prosecution argued—and the trial court agreed—that he was prevented from doing so because that fact was unsupported by the evidence. This Court cannot comprehend how the prosecution can then be found to not have had a duty to disclose that very evidence.

Because the Nevada Supreme Court made unreasonable factual determinations, this Court reviews this ground de novo. *See Panetti v.*

53

*Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires"); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that . . . the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim de novo.").

### 3.    Ground 11a

Slaughter argues that a crucial part of his alibi involved when the robbery ended, but the 911 call records, which would have documented the time the call was placed rather than just the time officers were dispatched, were not turned over to the defense. (ECF No. 91 at 55; *see also* ECF No. 65-2 at 14.)

The police report stated that "officers were dispatched" at 1911, *i.e.*, 7:11 p.m. (ECF No. 15-2 at 10.) Prior to closing arguments, outside the presence of the jury, the prosecutor contended that "[t]here is no report that shows what time the [911] call went into Metro," so the trial court ruled that the defense was limited to arguing that the call was placed at "about 7:00 p.m." (ECF No. 23-4 at 22–23.) However, the dispatch report, which was not disclosed to the defense until after the trial, stated that the 911 call was placed at 7:11 p.m. (ECF No. 65-2 at 14.) This was an exculpatory detail because Slaughter's alibi rested on the fact that he picked up Johnson from work between 7:00 and 7:20 p.m., according to Johnson's testimony, so the later the call was made, the later the robbers left the house, making Slaughter less likely to have been the culprit. (Prosecutors, relying on Arbuckle's testimony, argued that Slaughter picked up Johnson at 7:30 p.m.)

As was discussed previously, the dispatch report was in the State's possession, and the State had a duty to provide it to the defense. Accordingly, there is no meritorious argument that the dispatch report was not suppressed. Turning to materiality, having the dispatch report would have meant the defense could have shifted the timeline at trial by about 11 minutes in the defense's favor.

Given that the disputed window of time surrounding Slaughter's alibi was narrow, 11 minutes could have been crucial.

The Court will conduct a cumulative prejudice analysis under *Kyles* after determining whether evidence was suppressed in grounds 11b and 11c.

### 4. Ground 11b

Slaughter contends that the prosecution suppressed the fact that no one identified him from the second lineup. (ECF No. 91 at 58.)

In Detective Prieto's relevant police report, dated December 10, 2004, he stated that no one identified the second alleged suspect from the second photo lineup. (ECF No. 18 at 64.) However, his report stated nothing about Slaughter. (*See id.*) The second photo lineup cards had no marks whatsoever on them, and, importantly, the prosecutor confirmed that those second photo lineup cards were indeed used, indicating that no identifications were made and negating any argument that they were merely unmarked copies. (*See* ECF No. 18-13 at 8.)

Slaughter filed a pretrial motion on October 27, 2009, moving to dismiss the case due to the State's failure to preserve the "exculpatory [second] photo lineup identification evidence," arguing that the defense had no information regarding who the second photo lineup was shown to, what was said during the presentation of that second photo lineup, when the second photo lineup was shown, or what any witness said in response to the second photo lineup. (ECF No. 18 at 2.) The prosecution opposed the motion, arguing merely that the second photo lineups themselves were provided to Slaughter's counsel but failing to address Slaughter's specific concerns regarding the details surrounding the second photo lineups that were incapable of being deduced from the blank lineups themselves. (ECF No. 18-2 at 3.) Importantly, the prosecution also included the following footnote: "Defendant asserts that none of the witnesses identified [him] in those photo lineups. That conclusion is speculation on the part of the Defendant, however, he is free to cross examine the witnesses on that fact."

(*Id.*) At a hearing on the pretrial motion, held on December 1, 2009, defense counsel stated, "[a]ll the information we have is that [Slaughter apparently] wasn't identified when these photo lineups were shown to the victims." (ECF No. 18-13 at 8.) In response, the prosecutor conceded that the second alleged suspect was not identified by any of the victims, but the defense was "taking a giant leap . . . to say Rickie Slaughter wasn't picked out of those photo lineups," arguing that Slaughter was "free to cross-examine the detective or the witnesses on what other information he wants to know." (*Id.* at 10.) The trial court denied the motion to dismiss, finding that nothing was destroyed or failed to be preserved. (*Id.* at 13.)

Later, during Detective Prieto's post-conviction deposition held on February 22, 2018, he was asked if "any of the victims identif[ied] *anyone* from" the second lineup, and Detective Prieto answered, "[i]f my report reflects that they didn't, then they didn't." (ECF No. 41-5 at 89 (emphasis added).) Comparatively, on July 26, 2019, in his post-conviction deposition, the prosecutor, testified that (1) it was a mistake for "Detective Prieto [to have] both Rickie Slaughter and [the second alleged suspect] in [a] single lineup," (2) when he met with Young and his wife "before the original 2005 trial date," he remembered "one of them said, well, actually there were two photo lineups with Rickie Slaughter in them," (3) it was his impression that Detective Prieto only learned that Slaughter was in the second photo lineup when the prosecutor called him following his meeting with Young and his wife, (4) "one or more of those witnesses had to have recognized Rickie Slaughter because [he] would have never known about the photo lineup" otherwise, and (5) he did not say at the pretrial hearing on December 1, 2009 "that the victims themselves told the State Rickie was in the second photo lineup." (ECF No. 61-3 at 66–67, 71, 73, 85, 112.)

None of the witnesses told Detective Prieto that they recognized Slaughter in the second photo lineup. Given that the issue at trial regarded the identity of

the suspect, this information was highly exculpatory and material.[10] It bears noting that even without the second lineup, only four of the seven witnesses identified Slaughter in the first lineup, and only three of them identified him at trial. Those identifications were highly susceptible to impeachment given that not a single witness recognized Slaughter in the second photo lineup. And although Young or his wife had allegedly recognized Slaughter in that second photo lineup, their failure to verbalize this fact until years later was certainly still fodder for impeachment. Accordingly, the results of the second photo lineup could have proven that the results of the first photo lineup were problematic.

The second lineup was also arguably more reliable than the first because it lacked certain suggestive elements. Because Detective Prieto did not know that Slaughter was in the second photo lineup, it was a double-blind lineup, in which neither Detective Prieto nor the witnesses believed or were told that a prime suspect was among the six photos. Unlike the first lineup, the second lineup included Slaughter's booking photos so the background and lighting was consistent with the other photos. The absence of suggestive elements would have reduced or eliminated any expectation bias and would have ensured objective and accurate results.

Turning to suppression, the details surrounding the second photo lineups, including, importantly, the lack of verbal identification by any witness of Slaughter to Detective Prieto, were never provided to the defense. And further

---

[10] In arguing that the second lineup was not exculpatory, Respondents speculate that Detective Prieto told the witnesses when conducting the second lineup to only identify the second suspect. (ECF 127 at 15.) This argument lacks any record support. Importantly, the printed instructions on the identification cards, which were the same for both the first and second lineups, tell the witnesses to identify *anyone* they have seen before, initial the identification, complete additional comments, and sign and date the card. (ECF 65-2 at 7-10.) There is no evidence that Detective Prieto in administering the second lineup instructed witnesses to disregard those instructions or told them anything else. (*See* ECF No. 41-5 at 70–71 (testimony of Detective Prieto that he could not recall any of the details surrounding the second photo lineup).)

than that, the prosecutor appears to have actively misled Slaughter's trial counsel and the trial court in this regard. First, the prosecutor stated that it was merely speculation that Slaughter was not identified in the second photo lineup, but this was disingenuous because the prosecutor and Detective Prieto were working together to convict Slaughter, meaning the prosecutor could have—and should have—asked Detective Prieto about the second photo lineup results given his duty under *Brady*. Second, the prosecutor said that the defense was "taking a giant leap . . . to say Rickie Slaughter wasn't picked out of those photo lineups." Even if this statement was not technically a lie given that Young or his wife told the prosecutor in 2005 that they had recognized Slaughter in the second photo lineup, it was nonetheless very deceptive and misleading because the defense had no knowledge of this 2005 discussion and therefore could have reasonably assumed that the prosecutor's "giant leap" comment regarded the 2004 lineup by Detective Prieto. *See Gantt v. Roe*, 389 F.3d 908, 913 (9th Cir. 2004) (finding that information was suppressed within the meaning of *Brady* because "he was surely entitled to rely on the prosecution's representation"); *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (finding suppression where the government told defense counsel of the existence of certain tapes but also stated that those tapes would be of no value).

### 5.    Ground 11c

Slaughter contends that Arbuckle's testimony that he left work at 7:30 p.m. on the evening of the robbery and that Slaughter had not arrived yet to pick up Johnson was hurtful to the defense, but this evidence could have been impeached if the state had disclosed that Arbuckle had called the police on Slaughter for trespassing mere weeks before the incident. (ECF No. 91 at 66; *see also* ECF No. 65-2 at 12.) Slaughter fails to show that this impeachment evidence was suppressed. Rather, as the Nevada Supreme Court reasonably noted, Slaughter stated that, "after receiving [his trial counsel's] case file [after trial] . . .and

reviewing a 'print-out' of my S.C.O.P.E. record," his trial counsel was on notice of this trespassing call. (ECF No. 26-13 at 53.)

### 6.   Cumulative prejudice of grounds 11a and 11b

This Court finds that Slaughter is entitled to a new trial because, under *Kyles*, "the net effect of the evidence withheld by the State in this case raises a reasonable probability that its disclosure would have produced a different result." 514 U.S. at 421–22.

The evidence of Slaughter's guilt falls into five categories: (1) the witness identifications, (2) the surveillance video from 7-Eleven, (3) the getaway vehicle, (4) the weapons and ammunition, and (5) the fabricated alibi. The suppressed evidence would have affected various parts of this evidence and strengthened Slaughter's core defense, premised on misidentification, alibi, and the absence of physical evidence linking him to the crime, that "Rickie simply wasn't there." ECF 23-4 at 29.

First, only four of the seven witnesses—57%—identified Slaughter from the first photo lineup, and only three of the seven witnesses—43%—identified Slaughter at trial.[11] Comparatively, *none* of the seven witnesses—0%—told Detective Prieto that they recognized Slaughter from the second photo lineup. This is of paramount importance. The eyewitness identifications were the State's strongest evidence of Slaughter's guilt and a centerpiece of its closing argument at trial. *See* ECF 23-4 at 14 ("Not one, 2, not 3, but 4 individuals, separate positive eyewitness identification in this case, all direct evidence that Rickie Slaughter is the person who perpetrated these crimes."); *Id.* at 39 ("How could all 4 people pick out the wrong guy.") Yet the lack of verbal identifications in the second photo

---

[11] As was discussed previously, Means identified Slaughter from the photo lineup, Young identified Slaughter from the photo lineup and in court, Johns identified Slaughter from the photo lineup and in court, and Young's nephew identified Slaughter from the photo lineup and in court. (ECF No. 21 at 11, 14, 18; ECF No. 21-3 at 21-22; ECF No. 22-1 at 14-15.)

lineup devastates the first photo lineup identifications and in-court identifications. Indeed, competent counsel could have used the lack of identifications from the second photo lineup to severely impeach the witnesses' first photo lineup identifications and in-court identifications. Had competent counsel confronted the four witnesses about their inconsistent identifications, especially in conjunction with the other three witnesses' lack of any identification, and then highlighted the untrustworthiness of the alleged eyewitness evidence in this case during closing argument, it is difficult to believe that the jury would have been convinced of Slaughter's participation in the robbery.

The failure of any witness to identify Slaughter in the second lineup also would have made more plausible Slaughter's theory in closing argument that there was an alternative suspect, Eric Dawkins, who police failed to pursue. (ECF 23-4 at 34.) This theory was supported by the testimony of Thomas Winter, who contacted Crime Stoppers after seeing a report about the robbery on television. Winter testified that he recognized the individual as Dawkins, his former tenant, who drove a green Chevy Malibu and spoke with a Jamaican accent. (ECF 22-1 at 26-27.) Winters told police that Dawkins, who was the same age and roughly the same height as Slaughter, was a suspect in "a burglary case about two months ago" involving a "method of operation" that "matches" the robbery in this case, and that Dawkins was "always seen with" his brother-in-law. (ECF 15-2 at 12.)

Second, the 7-Eleven surveillance video was inconclusive. While police were still on the scene following the 911 call, Johns called Wells Fargo and was told that "$201.50 was just taken" from an ATM at a 7-Eleven. (ECF No. 15-2 at 11.) It is far from clear that the person showed in that surveillance footage was Slaughter. (*See* ECF No. 22.) In fact, the 7-Eleven employee testified at trial that the man was wearing "a mask over his face, over a part of his face, and his head slightly covered." (ECF No. 21-3 at 11.) Similarly, a police report described the

ATM video as follows: "at about 7:56pm . . . two subjects approach the store. . . . The subject that entered [the store] had his face and head . . . covered with a scarf." (ECF No. 15-8 at 8.)

Third, the evidence that Slaughter was driving the getaway vehicle was mixed and possibly shows that Detective Prieto acted with tunnel vision. Waddy, who did not identify Slaughter from either photo lineup, told police that the robbers drove away in a dark green vehicle, "possibly a Pontiac Grand Am." (ECF No. 15-2 at 11.) Waddy's statement was consistent with Winter's testimony at trial that the alternate suspect drove a "green Chevy Malibu." (ECF 22-1 at 26.) Nonetheless, Detective Prieto turned his attention immediately to investigating Slaughter based on the tip of a confidential informant, who told him that Slaughter's girlfriend drove a green Ford Taurus. (ECF 15-8 at 6.) At trial, Young testified that he "believe[d the robbers had been driving] a green Ford - - what was it? Like Taurus." (ECF No. 21 at 14.) Comparatively, Young's wife testified that the robber's car "had to be either a Mercury Topaz or maybe a Ford Tempo teal or maybe blue four door." (ECF 21 at 33.)

Fourth, the prosecution presented evidence that the robbers brandished three guns, and that Young was shot with a .357-caliber bullet. (ECF No. 21 at 41-48; ECF No. 21-3 at 36-44.) This can be compared to the two guns and a .357 shell casing that were found in the trunk of the car Slaughter was driving. Importantly, the weapons and ammunition evidence merely established the possibility that items found in Slaughter's car were consistent with those from the robbery. First, the state's firearm expert conceded at trial that there was no forensic evidence tying the guns found in the car Slaughter was driving to the crime scene and no definitive forensic link between the shell casing from the car and the bullet fragments from the crime scene. (ECF No. 21-3 at 38–39.) Second, the prosecutor conceded the mere consistency—not exact match—of this evidence during closing statements. (*See* ECF No. 23-4 at 15.) And third,

61

Respondents concede that "[t]here was no exact evidence showing an exact match." (ECF 127 at 44.) Accordingly, this amounts to a mere possible connection, not a definite link between Slaughter's car and the crime scene.

Fifth, the prosecution played a jailhouse phone call between Slaughter and Johnson, wherein Johnson said that the police had asked her whether Slaughter arrived to pick her up on time, and she told them that she "got off [work] a few minutes early, so [Slaughter] was there before 7:30." (ECF No. 22-3 at 5.) Slaughter then stated to Johnson, "I was there . . . at . . . 7 o'clock." (*Id.* at 6.) The prosecution inferred that Slaughter was attempting to fabricate an alibi with this statement. This interpretation, while reasonable, lacked certainty. Arbuckle testified that the store closed at 7:00 p.m. on the day in question (ECF No. 21-3 at 13), so if Johnson got off work a few minutes early, this would mean she got off a few minutes before 7:00 p.m., not a few minutes before 7:30 p.m. Thus, Slaughter's statement to Johnson that he got to her workplace at 7:00 p.m. could also be reasonably interpreted as him simply correcting Johnson's confusion about the timing of events. Moreover, not only did Slaughter's statement to Johnson not amount to fabrication, but also, on the opposite side of the coin, Detective Prieto made statements to Johnson that did amount to fabrication. At the time of Slaughter's arrest, Johnson told police that "Slaughter had come to pick her up on the day of the incident at 7 PM." (ECF No. 19 at 56.) The following day, Johnson was interviewed by Detective Prieto. Detective Prieto was questioning Johnson about what time Slaughter had arrived to pick her up, and Detective Prieto stated, "I don't want to get you into any trouble." (Id. at 30.) Johnson changed the timeline, saying that Slaughter picked her up on the day of the incident "[a] little bit before" 7:30pm. (*Id.* at 32.) In his police report, Detective Prieto stated that he had "caught [Johnson] in a lie, while trying to provide an alibi for Slaughter." (*Id.* at 56.) Detective Prieto then arrested Johnson for obstruction. (*Id.*) During Slaughter's trial, Johnson testified that Slaughter picked

her up on the day of the incident "between 7:00 [and] 7:15; no later than 7:20." (ECF No. 22-8 at 9.) Johnson testified that she changed the time during her police interview because Detective Prieto had threatened her. (*Id.* at 8.)

Notably, in addition to these fragments of evidence of Slaughter's guilt—the weakened witness identifications, the ambiguous surveillance video from 7-Eleven, the mere possibility that Slaughter had been driving the same make and model car as the getaway vehicle, the undeveloped connection between the weapons and ammunition in Slaughter's car and the weapons and ammunition used at the crime scene, and the questionable fabrication of an alibi—the prosecution presented no forensic evidence, such as DNA, hair, or fingerprints, from the scene that linked back to Slaughter, no incriminating evidence from the search of Slaughter's apartment, and no confession. Thus, the prosecution's evidence of guilt would have been markedly weaker had the second lineup not been suppressed.

Contrarily, the defense's evidence of an alibi would have been markedly stronger had the 911 dispatch call not been suppressed. To illustrate, at trial, the defense presented evidence that the robbery ended at about 7:00 p.m. and that Slaughter picked up Johnson at work between approximately 7:15 p.m. and 7:30 p.m. The new evidence supporting Slaughter's alibi would show that the robbery ended later (a few minutes before 7:11 p.m.), making Slaughter's ability to pick up Johnson, who worked 20 minutes away, by 7:15 p.m. impossible and by 7:30 p.m. merely conceivable.[12]

In sum, in a case where identity was the central issue for the jury to decide, the suppressed evidence would have entitled the jury to find that (1) the

---

[12] The Court acknowledges and appreciates that the 911 dispatch report would not have guaranteed an acquittal in this case, but, importantly, such a showing is not required. *Kyles*, 514 U.S. at 434 ("[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.").

witnesses' identifications of Slaughter were potentially faulty, decreasing the strength of the prosecution's case and (2) Slaughter's ability to have gotten from the crime scene to Johnson's work was less likely, increasing the strength of the defense's case. The juxtaposition of these entitlements with the remaining underwhelming evidence eviscerates any confidence that the jury's verdict would have been unaffected by the suppressed evidence. *See Kyles*, 514 U.S. at 451 ("It is significant . . . that the physical evidence remaining unscathed would . . . hardly have amounted to overwhelming proof that Kyles was the murderer."). Rather, here, as in *Kyles*, Slaughter is able to "show[ ] that the favorable evidence could reasonably be taken to put the whole case in such a different light" such that the Court cannot find that Slaughter received a fair trial. *Id.* at 435.

The Court grants relief for ground 11a and 11b.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability. This Court has *sua sponte* evaluated the claims within the Fourth-Amended Petition for suitability for the issuance of a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a Certificate of Appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a Certificate of Appealability is appropriate only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this court's procedural ruling was correct. *Id.*

Applying these standards, this Court finds that a Certificate of

64

Appealability is warranted regarding the cumulative prejudicial effect of Slaughter's ineffective assistance of counsel claims in grounds 2, 3, and 4.[13] *See Strickland*, 466 U.S. at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the error<u>s</u>, the factfinder would have had a reasonable doubt respecting guilt." (Emphasis added)); *see also Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) ("[E]ven if no single error were prejudicial, where there are several substantial errors, their cumulative effect may nevertheless be so prejudicial as to require reversal." (internal quotation marks omitted)); *Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (holding "that the district court did no err in finding that the combined prejudice of the multiple errors committed in this case deprived Alcala of a fundamentally fair trial and constitutes a separate and independent basis for granting his petition"); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (finding that cumulative error compelled affirmance of the grant of habeas); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998) ("When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice."). As was discussed in this Order, the Nevada Supreme Court denied grounds 2, 3, and 4 all based on a lack of "prejudice because the evidence against him was overwhelming." (ECF No. 27-13 at 3.) Reasonable jurists could debate this finding. There can be no genuine dispute that Slaughter's trial counsel acted deficiently in presenting his alibi, in cross-examining the prosecution's witnesses, and in calling additional witnesses. Indeed, Slaughter's trial counsel's representation of Slaughter was careless, inattentive, and rather shocking. Slaughter's trial counsel had evidence to present a hardy alibi, but he presented

[13] Notably, this cumulative-trial-counsel-ineffectiveness claim is exhausted given that Slaughter raised it during his first state habeas proceedings and in his opening brief on appeal to the Nevada Supreme Court. (*See* ECF Nos. 26-13 at 80; 27-3 at 38.)

65

a mild version instead. He had ammunition to attack the prosecution's witnesses, but he failed to use it. And he had the unique opportunity to discredit the lead detective in this case, but he forgot to issue a subpoena. Thus, even though this Court is required to defer to the Nevada Supreme Court's lack of prejudice finding and is prevented from considering the suppressed evidence identified in ground 11 in relation to grounds 2, 3, and 4, the Court finds that reasonable jurists could debate whether Slaughter has made a compelling showing that there is a reasonable probability that, but for his trial counsel's numerous unprofessional errors, the result of his trial would have been different. *Strickland*, 466 U.S. at 694.

## V.    CONSTITUTIONALITY OF 28 U.S.C. § 2254(d)

Slaughter filed a notice of constitutional question, explaining that he is challenging the constitutionality of 28 U.S.C. § 2254(d). (ECF No. 146.) Slaughter argues that 2254(d) unconstitutionally infringes on the separation of powers and the independence of the federal judiciary. (*Id.*) This Court issued an Order notifying the Attorney General of the United States of this constitutional question and instructing the Attorney General of the United States to intervene in this action, if it chooses to do so, within 60 days. (ECF No. 147.) The Attorney General of the United States timely filed a notice of appearance and a response to this Court's Order. (ECF Nos. 148, 149.) Slaughter replied.[14] (ECF No. 150-1.)

Slaughter acknowledges that the Ninth Circuit has previously rejected a constitutional challenge to 28 U.S.C. § 2254(d),[15] but he argues that that holding is irreconcilable with the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). (ECF No. 140 at 25.) In *Loper*

---

[14] Slaughter moved for leave to file his reply. (*See* ECF No. 150.) This Court grants his request.

[15] *See Crater v. Galaza*, 491 F.3d 1119, 1129 (9th Cir. 2007) ("The constitutional foundation of § 2254(d)(1) is solidified by the Supreme Court's repeated application of the statute.").

*Bright*, the Supreme Court overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), dealing with the deference owed to agency interpretations of ambiguous statutes. 603 U.S. at 378–79. Analogizing *Chevron* deference with AEDPA deference, Slaughter argues that Congress cannot force Article III courts to abandon their independent judgment and instead defer to a state court's (a non-Article III actor) legal reasoning. (ECF No. 150-1.)

This Court is bound to follow controlling Supreme Court precedent until it has been explicitly overruled by that Court. *United States v. Werle*, 35 4th 1195, 1201 (9th Cir. 2022) (quoting *Nunez-Reyes v. Holder*, 646 F.3d 684, 693 (9th Cir. 2011) (en banc)). And here the Supreme Court did not explicitly (or implicitly) overrule AEDPA deference in *Loper Bright*—in fact, *Loper Bright* did not discuss AEDPA even in the slightest. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("If a precedent of this Court has direct application in a case, . . . a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decision. This is true even if the lower court thinks the precedent is in tension with some other line of decisions." (Internal quotation marks and citation omitted).) Rather, the Supreme Court has recently confirmed AEDPA's constitutionality. *See Brown v. Davenport*, 596 U.S. 118, 127 (2022) ("When Congress supplies a constitutionally valid rule of decision, federal courts must follow it. In AEDPA, Congress announced such a rule."). This Court rejects Slaughter's constitutionality challenge.

## VI.    CONCLUSION

It is therefore ordered that the Fourth-Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 [ECF No. 91] is granted as to grounds 11a and 11b. Petitioner Rickie Slaughter's Judgment of Conviction filed on October 22, 2012, in case number C204957, in the Eighth Judicial District Court for the State

of Nevada is vacated. Within 180 days[16] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this Court's Judgment, if affirmed, or (2) the expiration for seeking such appeal or review, the state court must commence a retrial.

It is further ordered that the Motion for Leave to File Document [ECF No. 150] is granted.

It is further ordered that, to the extent it is necessary, a Certificate of Appealability is granted for grounds 2, 3, and 4 and denied for the remaining grounds.

It is further ordered that the Clerk of Court (1) file the reply to the notice of constitutional question [ECF No. 150-1], (2) substitute Jeremy Bean for Respondent Brian Williams, (3) enter Judgment accordingly, (4) provide a copy of this Order and the Judgment to the Clerk of the Eighth Judicial District Court for the State of Nevada in connection with that court's case number C204957, and (5) close this case.

DATED THIS 3rd day of March 2026.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

---

[16]Reasonable requests for modification of this time may be made by either party.